COURT OF APPEALS DIV I
2013 MAY 13 AM 8: 59



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>FELIPE JOSEPH RAMOS,<br><br>Appellant. | No. 67757-8-I<br>(Consolidated with<br>No. 67758-6-I)<br><br>DIVISION ONE |
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>MARIO ALEJANDRO MEDINA,<br><br>Appellant. | UNPUBLISHED<br><br>FILED: May 13, 2013 |

Cox, J. — In these consolidated cases, codefendants Felipe Ramos and Mario Medina appeal their convictions and sentences. Medina, convicted of second degree murder, argues that the trial court abused its discretion when it allowed the State to amend the prior charging document. Medina also contends that the court erred when it failed to give him credit for time served prior to

sentencing in the King County Community Center for Alternative Programs (CCAP) Enhanced.

We hold that the court did not abuse its discretion by permitting amendment of the information prior to trial. And the court correctly declined to give credit for pre-trial confinement in CCAP Enhanced, although the basis for doing so was incorrect. We affirm Medina's conviction and sentence.

Ramos, convicted of first degree manslaughter, argues that the first degree manslaughter jury instruction at trial was legally incorrect and unconstitutionally lowered the State's burden of proof. He also argues that he was denied effective assistance of counsel when his attorney proposed this incorrect instruction.

We hold that Ramos is barred by the invited error doctrine from challenging the instruction his trial counsel proposed. But proposing that instruction deprived Ramos of his constitutional right to effective assistance of counsel. We reverse Ramos's conviction and remand for further proceedings.

In 1997, Medina lived with his sister, Maria,[1] and her ex-husband, Felipe Ramos. At the time, Maria worked as the night clerk at a Motel 6. Her boss there was Joe Collins.

On September 13, 1997, Maria was late to work, and Collins sent her home. After retrieving a handgun from the Medina/Ramos apartment, Medina and Ramos drove to the Motel 6 to confront Collins.

---

[1] We adopt the naming convention of the parties for naming Maria Medina for clarity.

Upon arriving at the Motel 6, Ramos and Medina began searching for Collins. After speaking with several witnesses, they knocked on his door. When Collins answered, Medina asked him if he "had a problem with Maria." Before Collins could answer, either Ramos or Medina shot him in the head, killing him.

In 1999, the State charged both Ramos and Medina with first degree intentional murder. The jury found them guilty of the lesser included offense of second degree felony murder, based on the predicate offense of second degree assault.

Both Ramos and Medina appealed.[2] Their appeals were then stayed, pending the outcome of several supreme court cases.[3] In re Andress, one of these decisions, held that a conviction for second degree felony murder could not be based upon a predicate crime of assault.[4] Based on this decision, this court vacated both convictions of Medina and Ramos, which were based on the predicate offense of second degree assault.[5]

On remand, the State charged both Medina and Ramos with first degree manslaughter. Both defendants moved to dismiss this charge, alleging that it violated double jeopardy and the mandatory joinder rule.[6] The supreme court

---

[2] See State v. Ramos, 124 Wn. App. 334, 101 P.3d 872 (2004).

[3] Id. at 337.

[4] 147 Wn.2d 602, 604, 56 P.3d 981 (2002), superseded by statute, RCW 9A.32.050.

[5] Ramos, 124 Wn. App. at 343.

[6] See State v. Ramos, 163 Wn.2d 654, 659, 184 P.3d 1256 (2008).

took direct review and held that the first degree manslaughter charges did not violate either provision.[7]

In 2010, following remand, the State moved to amend the prior charging document. The trial court granted the State's motion, and Medina and Ramos were both charged with second degree intentional murder.

Both men were tried before the same jury in June 2011. The jury found Medina guilty of second degree intentional murder. But it found Ramos guilty of the lesser included offense of first degree manslaughter.

Both Ramos and Medina appeal.

## AMENDMENT OF INFORMATION

Medina argues that the trial court abused its discretion by permitting the State to amend the prior information to include second degree murder. Although the amendment was five years after the initial charging document, it was over a year prior to trial. Because Medina fails to establish prejudice, there was no abuse of discretion in permitting amendment.

Superior Court Criminal Rule (CrR) 2.1(d) allows a court to permit the State to amend an information "at any time before verdict or finding if substantial rights of the defendant are not prejudiced." Echoing the United States Supreme Court, our supreme court has recognized:

> "[A] prosecutor should remain free before trial to exercise the broad
> discretion entrusted to him [or her] to determine the extent of the
> societal interest in prosecution. An initial decision should not freeze
> future conduct. . . . [T]he initial charges filed by a prosecutor may

---

[7] Id. at 661-62.

not reflect the extent to which an individual is legitimately subject to prosecution."[8]

Such an amendment is within the court's discretion, and it is consequently reviewed by an appellate court for an abuse of discretion.[9]

CrR 2.1(d)'s provision for liberal amendment of a charging document is "tempered by article I, section 22 of the Washington Constitution, which requires that the accused be adequately informed of the charge to be met at trial."[10] This requirement ensures that a defendant is sufficiently apprised of the charges against him so that he can prepare a defense.[11]

Generally, "[a] defendant cannot claim error from the amendment of an information unless he can show he was prejudiced thereby."[12] Typically the prejudice that CrR 2.1(d) addresses is whether the amendment leaves the defendant without time to prepare a defense to a new charge.[13]

---

[8] State v. James, 108 Wn.2d 483, 488-89, 739 P.2d 699 (1987) (some alterations in original) (quoting United States v. Goodwin, 457 U.S. 368, 382, 102 S. Ct. 2485, 73 L. Ed. 2d 74 (1982)).

[9] Id. at 490.

[10] State v. Ziegler, 138 Wn. App. 804, 808, 158 P.3d 647 (2007).

[11] State v. Kosewicz, 174 Wn.2d 683, 691, 278 P.3d 184 (2012).

[12] State v. Jones, 26 Wn. App. 1, 6, 612 P.2d 404 (1980) (citing State v. Brown, 74 Wn.2d 799, 447 P.2d 82 (1968)).

[13] State v. Larson, 160 Wn. App. 577, 594, 249 P.3d 669, review denied, 172 Wn.2d 1002 (2011); see also State v. Murbach, 68 Wn. App. 509, 512, 843 P.2d 551 (1993).

For example, the supreme court has held that the possibility of a harsher penalty did not result in prejudice.[14] In State v. James, the State originally charged James with second degree murder.[15] A month later, after James made a tape recorded confession, the State moved to amend the charge to first degree murder.[16] In the same proceeding, James attempted to withdraw his original plea and plead guilty to the original charge.[17] Prior to the State's amendment, the State and James's counsel engaged in plea discussions during which the State made clear that it was considering amending the charge against James.[18]

The supreme court held that the amendment of the information was not prejudicial:

> While James has a conditional right to withdraw his not guilty plea, he has failed to sustain his burden of demonstrating specific prejudice resulting from the information amendment. James does not claim surprise or an inability to prepare a defense because of the trial court's ruling. At trial, James argued that being subject to the harsher penalty accompanying a first degree murder charge constituted specific prejudice. . . . [But] we find that the ***possibility of a harsher penalty, standing alone, cannot constitute specific prejudice.***[19]

The James court did note that because "the prosecution reached its decision to amend with reasonable dispatch, [and] without any suggestion of bad

---

[14] James, 108 Wn.2d at 484.

[15] Id. at 484-85.

[16] Id. at 485.

[17] Id. at 485-86.

[18] Id.

[19] Id. at 489-90 (emphasis added) (citations omitted).

faith. . . . [V]indictiveness, which the United States Supreme Court has viewed as prejudicial in the decision to charge, played no role in the State's motion to amend."[20]

Here, the amendment of the information to charge second degree murder followed a period of uncertainty on what charges could properly be made. Those uncertainties were finally resolved by the supreme court, the stay of the appeals was lifted, and the State moved to amend the information in February 2010. Medina's trial did not begin until June 2011, over a year later. Thus, Medina had more than ample time prior to trial to prepare a defense to the new charges against him. There is nothing in this record to suggest that he had insufficient time to prepare a defense to the amended charge. Likewise, there is nothing to suggest the loss of witnesses or other evidence that would support a showing of prejudice to Medina by allowing the amendment of the information. And there is no showing of vindictiveness by the State amending the charge against him.

As in James, the mere fact that the State's amendment increased the possible penalty Medina would face if convicted was not, by itself, prejudicial. The State's amendment of the information appears to have been motivated by the supreme court's opinion in this case, not by any vindictiveness.[21] The supreme court clarified that the prior jury verdict did not preclude a charge of

---

[20] Id. at 490.

[21] See State's Motion to Amend Information, Medina 2012 Clerk's Papers at 160-61 ("Once the proper analysis under the principles of alternative means was apparent, the State indicated the intent to amend the charges to intentional murder.").

first-degree manslaughter under the alternative means analysis.[22] Thus, after the court's decision in this case in 2008, the State determined that, under the alternative means analysis applied by the supreme court, it could still charge Medina with murder. It then moved to amend the information.

Medina argues that his case is distinguishable from James for three reasons. None are persuasive.

First, he argues that James did not, in fact, create a "per se rule and does not preclude Medina from arguing that the circumstances of his case . . . demonstrate prejudice." We agree. James involved both the question of when a defendant may withdraw a plea *and* when amendment of an information is prejudicial. And that court "evaluated the specific circumstances of James' case in deciding he could not show prejudice [by the amendment]." But this fact does not change the supreme court's holding, that "the possibility of a harsher penalty, standing alone, *cannot* constitute specific prejudice."[23]

Medina's argument is, essentially, that the possibility of a harsher penalty, occurring five years after the original information, is prejudicial. This argument is directly refuted by James.

Second, Medina argues that the "policy considerations" implicated in James are not present here, pointing out that the James court was concerned with balancing the State's interest in adapting to an ongoing investigation and the defendant's right to withdraw a plea. But similar policy considerations with

---

[22] Ramos, 163 Wn.2d at 660-62.

[23] James, 108 Wn.2d at 489-90.

regard to the State's interests are represented here. The State amended Medina's information only after the supreme court made clear that it could do so.[24] Like the James court's interest in allowing the State flexibility to adapt to an ongoing investigation, the State has an interest in adapting to a clarified legal landscape.

Third, Medina contends that unlike the defendant in James, he was prejudiced by the State's representations at his 2005 arraignment that he would only be charged for first degree manslaughter. It is true that in James, the defendant appears to have had some knowledge that the State was at least considering altering the charge against him.[25] But the mere fact that the State did not provide Medina a warning before the amendment does not, by itself, result in prejudice. There is no indication that the State sought a plea deal with Medina during the second trial. Thus, Medina fails to persuade us how lack of knowledge of the amended charge, prior to the State's official motion, prejudiced him.

Medina also asserts that the amendment of the information five years after his initial charge is itself prejudicial. But he cites no authority to support the

---

[24] See Medina 2012 Clerk's Papers at 160-61 ("Once the proper analysis under the principles of alternative means was apparent, the State indicated the intent to amend the charges to intentional murder.").

[25] James, 108 Wn.2d at 485.

contention that passage of time, well before trial, constitutes prejudice to a defendant. Medina relies on State v. Ziegler,[26] but this case is not helpful.

There, the supreme court concluded that the amendment of the counts for child rape *midtrial* prejudiced Ziegler.[27] The court permitted the State to amend the information during trial, changing the first degree child rape charge to a first degree child molestation charge and adding two first degree rape charges.[28] Thus, because of the midtrial amendment, Ziegler was not able to properly prepare a defense and was prejudiced.[29] That is not the case here.

It is true that in holding that the amendment was prejudicial to Ziegler and thus an abuse of discretion, the supreme court stated that "[a]dding two child rape charges during trial affected Ziegler's ability to prepare his defense. His trial strategy and *plea negotiations* with the State would likely have been different had he known there would be two additional child rape charges."[30] We are not convinced that this passing mention of plea negotiations means that anytime the State increases a charge against a defendant by amendment of the information, he or she is prejudiced by a demonstration that a plea would have been taken before amendment.

---

[26] 138 Wn. App. 804, 158 P.3d 647 (2007).

[27] Id. at 810-11.

[28] Id. at 807.

[29] Id. at 811.

[30] Id. (emphasis added).

Finally, Medina points to the United States Supreme Court's recent decision in Missouri v. Frye,[31] arguing that its enunciation of the importance of plea bargaining in the criminal justice system somehow trumps our state court's interpretation of CrR 2.1(d). It does not.

Frye addressed whether a defendant received ineffective assistance of counsel where his attorney failed to inform him of two plea bargains offered by the State.[32] The Supreme Court held that such action by an attorney fell below the proper standard of representation.[33] In contrast, there is no evidence here that a plea bargain was ever offered to Medina. Thus, Frye is inapplicable.

## CREDIT FOR TIME SERVED

Medina next argues that he is entitled to credit against his sentence because the time he spent before sentencing in King County's CCAP Enhanced qualifies under governing statutes. We disagree.

An offender sentenced to a term of confinement has both a constitutional and a statutory right to receive credit for confinement for time served before sentencing.[34] The failure to provide credit for time served in confinement violates

---

[31] ___ U.S. ___, 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012).

[32] Id. at 1404, 1409.

[33] Id. at 1408-09.

[34] RCW 9.94A.505; State v. Speaks, 119 Wn.2d 204, 206, 829 P.2d 1096 (1992).

11

due process, equal protection, and the double jeopardy prohibition against multiple punishments.[35]

Under RCW 9.94A.345, "[a]ny sentence imposed under [the SRA] shall be determined in accordance with the law in effect when the current offense was committed." "Generally statutes are presumed to apply prospectively, unless there is some legislative indication to the contrary."[36] Under the SRA, "The sentencing court shall give the offender credit for all confinement time served before the sentencing if that confinement was solely in regard to the offense for which the offender is being sentenced."[37] "'Confinement' means total or partial confinement as defined in [the SRA]."[38]

---

[35] In re Pers. Restraint of Costello, 131 Wn. App. 828, 832, 129 P.3d 827 (2006). But see Harris v. Charles, 151 Wn. App. 929, 936-37, 214 P.3d 962 (2009) (holding that failure to credit time served in electronic home monitoring to misdemeanor sentence was not a violation of defendant's equal protection rights because there is a rational basis for treating misdemeanants differently than felons).

[36] State v. Humphrey, 139 Wn.2d 53, 57, 983 P.2d 1118 (1999); Howell v. Spokane & Inland Empire Blood Bank, 114 Wn.2d 42, 47, 785 P.2d 815 (1990) ("Statutory amendments are . . . presumed to be prospective unless there is a legislative intent to the contrary or the amendment is clearly curative."); State v. Douty, 92 Wn.2d 930, 935, 603 P.2d 373 (1979) ("It is a fundamental rule of statutory construction that a statute is presumed to operate prospectively and ought not to be construed to operate retrospectively in the absence of language clearly indicating such a legislative intent." (quoting Earle v. Froedtert Grain & Malting Co., 197 Wash. 341, 344, 85 P.2d 264 (1938))).

[37] Former RCW 9.94A.120(16) (1988); see also RCW 9.94A.680.

[38] Former RCW 9.94A.030(8) (1988).

We may affirm on any ground supported by the record even if that ground was not argued to the trial court. [39]

Here, the trial court imposed a sentence of 183 months.[40] Medina sought credit against this sentence for 1,505 days served prior to sentencing in King County's CCAP Enhanced.[41] In doing so, he relied exclusively on RCW 9.94A.680, a statute that provides for alternatives to total confinement.[42]

The record shows that he was in this local program during 2007 and after, following serving time in prison.[43] The trial court denied credit on the basis that this statute, by its terms, applies only to offenders with sentences of one year or less.[44] Because Medina's 183 month sentence exceeded that term, the trial court denied his request for credit under CCAP Enhanced.[45]

But the trial court granted credit to Medina for 1,084 days time actually served in confinement in the King County Jail prior to sentencing.[46] This part of the sentence is not at issue on appeal.

---

[39] LaMon v. Butler, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989).

[40] Medina 2012 Clerk's Papers at 188.

[41] Sentencing Hearing, Report of Proceedings (Sept. 30, 2011) at 4-5, 19.

[42] Id. at 7.

[43] Id. at 13; Medina 2012 Clerk's Papers at 179-189.

[44] Report of Proceedings (Sept. 30, 2011) at 15, 19.

[45] Id. at 15-16.

[46] Medina 2012 Clerk's Papers at 188.

Here, Medina contends that his time spent prior to sentencing in King County's CCAP Enhanced constitutes "confinement" for which he is entitled to credit against his sentence under governing statutes. We conclude that neither the record nor the governing statutes supports this claim.

First, RCW 9.94A.680, on which Medina primarily relies, was not enacted until 1999. This was well after the time of Medina's crime in September 1997. Accordingly, RCW 9.94A.345 bars application of this statute to this sentencing because it was not in effect at the time of Medina's crime.

Second, there is nothing in RCW 9.94A.680 that indicates that it has retroactive effect.

For these reasons, this statute has no bearing on the question that we must decide: whether credit for time served prior to sentencing in CCAP Enhanced should be applied to Medina's sentence for his September 1997 crime.

Medina argues that CCAP Enhanced constitutes "partial confinement" for which he is entitled to credit against his sentence. We are not persuaded that this is correct.

The question of what activities qualify for credit for time served is one of statutory interpretation. When engaging in statutory interpretation, an appellate court looks first to the statute's plain language.[47] If the statute's meaning is plain on its face, the inquiry ends.[48] A statute is ambiguous when it is susceptible to

---

[47] State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007).

[48] Id.

two or more reasonable interpretations.[49] But a statute is not ambiguous merely because different interpretations are possible.[50] The meaning of a statute is a question of law that an appellate court reviews de novo.[51]

As we have already explained, for purposes of sentencing credit, the applicable definition of "confinement" was that existing at the time of Medina's crime in September 1997. Under the SRA, as it then read, confinement included "total or partial confinement."[52] "Partial confinement," which is at issue here, was then defined as:

> ***confinement for no more than one year in a facility or institution operated or utilized*** under contract ***by*** the state or ***any other unit of government***, or, if home detention or work crew has been ordered by the court, in an approved residence, ***for a substantial portion of each day*** with the balance of the day spent in the community. Partial confinement includes work release, home detention, work crew, and a combination of work crew and home detention as defined in this section.[53]

The above emphasized language shows that there were temporal requirements to qualify for partial confinement at the time of Medina's crime. As the State argues, there does not appear to be any definition in this statute of the phrase "a substantial portion of each day," one of these temporal requirements.

---

[49] HomeStreet, Inc. v. Dep't of Revenue, 166 Wn.2d 444, 452, 210 P.3d 297 (2009) (quoting State v. Hahn, 83 Wn. App. 825, 831, 924 P.2d 392 (1996)).

[50] Id.

[51] Okeson v. City of Seattle, 150 Wn.2d 540, 548-49, 78 P.3d 1279 (2003).

[52] Former RCW 9.94A.030(8) (1988).

[53] Former RCW 9.94A.030(26) (1991) (emphasis added).

But the State correctly argues that former RCW 9.94A.180(1) (1988) provides as follows:

> An offender sentenced to a term of partial confinement *shall* be confined in the facility for *at least eight hours per day* . . . .[54]

Harmonizing these statutes, to qualify for time served in partial confinement an offender must demonstrate that this partial confinement included at least eight hours per day in a "facility." There is nothing in this record to substantiate that Medina met the eight hour daily minimum requirement in CCAP Enhanced. This failure is fatal to his claim for credit for time served.

Citing RCW 9.94A.030(35), a current definitional provision of the SRA, Medina argues that the varied requirements of partial confinement programs do not require participation for a specific minimum number of hours per day or per week.[55] The programs to which he refers include work release, work crew, home detention, and a combination of work crew and home detention. We cannot agree.

As we previously stated in this opinion, the controlling definitional provision for determining Medina's sentencing credit was the definitional section of the SRA in effect at the time of Medina's crime. That statute was former RCW 9.94A.030(26) (1991), which stated:

> Partial confinement includes work release, home detention, work crew, and a combination of work crew and home detention as defined in [the SRA].

---

[54] (Emphasis added.)

[55] Brief of Appellant at 16 et seq.

Although the language of the current and former provisions is identical, Medina has not pointed to anything in this record to substantiate that he was either in any of these individual programs or a "combination of work crew and home detention" for the relevant time. This failure is also fatal to his argument.

Medina also appears to argue that his participation in CCAP Enhanced in 2007 and after is sufficiently similar to the programs specified in former RCW 9.94A.030(26) (1991) to qualify as confinement for purposes of credit for time served. We again disagree.

"Work crew" was defined under former RCW 9.94A.030(34) (1991) as:

[A] program of partial confinement consisting of civic improvement tasks for the benefit of the community of not less than thirty-five hours per week that complies with RCW 9.94A.135. . . . Only those offenders sentenced to a facility operated or utilized under contract by a county or the state are eligible to participate on a work crew.[56]

Under former RCW 9.94A.135 (1991):

An offender who has successfully completed four weeks of work crew at thirty-five hours per week shall thereafter receive credit towards the work crew sentence for hours worked at approved, verified employment. Such employment credit may be earned for up to twenty-four hours actual employment per week, provided, however, that every such offender shall continue active participation in work crews projects according to a schedule approved by a work crew supervisor until the work crew sentence has been served.

"Work release" was defined in the 1997 SRA as:

[A] program of partial confinement available to offenders who are employed or engaged as a student in a regular course of study at school. Participation in work release shall be conditioned upon the

---

[56] Former RCW 9.94A.030(39) (1995).

offender attending work or school at regularly defined hours and abiding by the rules of the work release facility. [57]

Generally, one is partially confined in a residential facility during work release.[58]

Medina has failed to establish in this record that his participation in CCAP Enhanced was sufficiently similar to the above programs to qualify for credit. The section of the King County Municipal Code enacting the general CCAP program provides:

> A.  The community corrections division of the department of adult and juvenile detention shall provide a county supervised community option for offenders convicted of nonviolent and non-sex offenses with sentences of one year or less as provided in RCW 9.94A.680.

> B.  For the purposes of this section, "county supervised option" means an alternative to confinement program in which an offender must participate for a minimum of six hours per day of structured programs offered through, or approved by, the community corrections division.  The structured programs may include, but are not limited to: life management skills development; substance abuse assessment and treatment services; mental health assessment and treatment services; counseling; basic adult education and related services; vocational training services; and job placement services.[59]

The King County Department of Adult and Juvenile Detention further outlines CCAP as a program that "holds offenders accountable to a weekly itinerary

---

[57] Former RCW 9.94A.030(41) (1997).

[58] See Citizens for Fair Share v. State Dep't of Corr., 117 Wn. App. 411, 423, 72 P.3d 206 (2003) (deferring to the Department of Corrections interpretation that a "facility" is a *residential* facility when considering work release programs).

[59] King County Code § 5.12.010, available at http://www.kingcounty.gov/council/legislation/kc_code/08_Title_5.aspx.

directed at involving the offender in a continuum of structured programs."[60]

CCAP is aimed at providing offenders with the services that fit their needs:

> The goal of CCAP is to assist offenders in changing those behaviors that have contributed to their being charged with a crime. CCAP provides on-site services as well as referrals to community-based services. Random drug tests are conducted to monitor for illegal drug use and consumption of alcohol. Offenders participating in CCAP receive an individual needs assessment and are scheduled for a variety of programs.[61]

Consistent with state statutes, this program only requires six hours per day—not the eight hour minimum required under former RCW 9.94A.180(1) (1988). Significantly, there is nothing in this record to show what Medina did or for how long during his time in CCAP Enhanced. The above description of CCAP does nothing to fill this gap. Without such information, there is no way to show that this program is sufficiently similar to partial confinement, as defined in 1997 by state statute.

Given this sparse appellate record, the adequacy of which is Medina's burden to provide, he is not entitled to pre-sentencing credit under governing law.

While neither party addresses the point, there is another reason why Medina is not entitled to credit for time served in CCAP Enhanced. Former RCW 9.94A.380 (1988), the statute that was in effect at the time of his September 1997 crime, provided as follows:

> Alternatives to total confinement are available for offenders with sentences of one year or less. These alternatives include the

---

[60] King County Department of Adult and Juvenile Detention, available at http://www.kingcounty.gov/courts/detention/community_corrections/programs.aspx#ccap.

[61] Id.

following sentence conditions that the court may order as substitutes for total confinement:

(1) One day of partial confinement may be substituted for one day of total confinement;

(2) In addition, for offenders convicted of nonviolent offenses only, eight hours of community service may be substituted for one day of total confinement, with a maximum conversion limit of two hundred forty hours or thirty days. Community service hours must be completed within the period of community supervision or a time period specified by the court, which shall not exceed twenty-four months, pursuant to a schedule determined by the department.

For sentences of nonviolent offenders for one year or less, the court shall consider and give priority to available alternatives to total confinement and shall state its reasons in writing on the judgment and sentence form if the alternatives are not used.

The plain words of this statute buttress our conclusion that Medina was not entitled to credit for time served. His confinement was for more than one year. Murder, the offense for which he was convicted, is not a "nonviolent offense." And his failure to qualify under both of these criteria made him ineligible for "available alternatives to total confinement."

To summarize, RCW 9.94A.680, on which Medina primarily relies does not control the question of whether he is entitled to time served in CCAP Enhanced because it was not in effect at the time of his September 1997 crime. Rather, former RCW 9.94A.380 (1988) is the controlling statute. Significantly, Medina fails to show that his activities in CCAP Enhanced qualify for credit for time served either under the provisions of RCW 9.94A.380 or under the more general provisions of the SRA.

*Rule of Lenity*

Medina argues that, to the extent that the applicable statutes could be ambiguous as to credit for time served in CCAP Enhanced, the rule of lenity applies. Because the governing statutes that we have discussed are clear, the rule of lenity has no place here.

"The rule of lenity requires [a court] to interpret an ambiguous criminal statute in favor of the defendant absent legislative intent to the contrary."[62] For the reasons previously explained, the statutes are not ambiguous. They are not susceptible to two or more reasonable readings.

We have already discussed what statutes govern and why. There is no ambiguity in these statutes that requires us to consider the rule of lenity.

*Equal Protection and Double Jeopardy*

Finally, Medina contends that the trial court's failure to credit his time spent in CCAP Enhanced violates double jeopardy and his right to equal protection. This is not the case.

Under North Carolina v. Pearce,[63] a case on which Medina relies, the Fifth Amendment guarantee against double jeopardy "is violated when punishment already exacted for an offense is not fully 'credited' in imposing sentence upon a new conviction for the same offense."[64] Thus, the protection against double

---

[62] State v. Mandanas, 168 Wn.2d 84, 88, 228 P.3d 13 (2010).

[63] 395 U.S. 711, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969), overruled in part by Ala. v. Smith, 490 U.S. 794, 801, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989).

[64] Id. at 718.

jeopardy "requires that punishment already exacted must be fully 'credited' in imposing sentence upon a new conviction for the same offense." [65]

Here, Medina is not entitled to credit for time served before sentencing in CCAP Enhanced for the reasons we explained previously in this opinion. Thus, there is no question of him being subjected to double jeopardy. Pearce does not require a different result.

Similarly, Medina's equal protection argument depends on him being entitled to credit for time served under CCAP Enhanced. Under State v. Anderson[66] and State v. Swiger,[67] the supreme court held that a condition that would qualify as confinement pre-conviction must also qualify as such post-conviction.[68] But here, as explained previously in this opinion, Medina is not entitled to time served presentence in CCAP Enhanced. There is no equal protection violation.

We next consider the claims of Ramos.

## JURY INSTRUCTION

Ramos argues that the trial court's first degree manslaughter jury instruction violated his right to due process because it lowered the State's burden of proof. While the jury instruction given by the court did lower the burden of

---

[65] Id. at 718-19.

[66] 132 Wn.2d 203, 937 P.2d 581 (1997).

[67] 159 Wn.2d 224, 149 P.3d 372 (2006).

[68] Id. at 229-30; Anderson, 132 Wn.2d at 207-08.

proof, his counsel agreed to it. Thus, this claim of error is barred by the invited error doctrine.

Under State v. Gamble[69] and State v. Peters,[70] to convict a defendant of first degree manslaughter "requires the State to prove beyond a reasonable doubt that the defendant knew of and disregarded a substantial risk that *death may occur*."[71] This court held in Peters that a jury instruction

> that defines reckless to mean [the defendant] knew of and disregarded "a substantial risk that a wrongful act may occur," rather than "a substantial risk that death may occur," is contrary to Gamble and WPIC 10.03. The instruction impermissibly relieve[s] the State of the burden of proving beyond a reasonable doubt that [the defendant] knew of and disregarded a substantial risk that death may occur, and allowed the jury to convict [the defendant] of only a wrongful act.[72]

Whether a jury instruction has impermissibly lowered the State's burden of proof is a question of law that this court reviews de novo.[73]

The State concedes that the supreme court's decision in Gamble and our decision in Peters require a correct jury instruction for first degree manslaughter, one other than that used here. Nevertheless, Ramos's own counsel proposed instructions that included the "wrongful act" language in the first degree manslaughter instructions. Thus, the invited error doctrine precludes Ramos's appeal based on this error.

---

[69] 154 Wn.2d 457, 114 P.3d 646 (2005).

[70] 163 Wn. App. 836, 261 P.3d 199 (2011).

[71] Id. at 848 (citing Gamble, 154 Wn.2d at 467-68).

[72] Id. at 849-50.

[73] Id. at 847.

Under the doctrine of invited error, a party is prohibited from "'setting up an error at trial and then complaining of it on appeal.'"[74] Thus, a court "will deem an error waived if the party asserting such error materially contributed thereto."[75] The invited error doctrine generally requires a defendant's affirmative act to have set up the complained of error, that is, a voluntary and knowing action. The supreme court has made clear that this includes requested instructions. "'[A] party may not request an instruction and later complain on appeal that the requested instruction was given.'"[76]

Here, Ramos's counsel proposed the complained-of instruction. Consequently, Ramos cannot now argue that this error should result in a vacation of his sentence.

Ramos argues that Peters requires reversal of his conviction, but he fails to note the significance of *who* proposed the improper instructions in that case. There, the trial court disagreed with the State and defense's proposed instructions, and it suggested and then instructed on the improper standard.[77] That is not the case here, where Ramos's counsel proposed the improper instruction.

---

[74] State v. Wakefield, 130 Wn.2d 464, 475, 925 P.2d 183 (1996) (quoting State v. Pam, 101 Wn.2d 507, 511, 680 P.2d 762 (1984)).

[75] In re Dependency of K.R., 128 Wn.2d 129, 147, 904 P.2d 1132 (1995).

[76] State v. Studd, 137 Wn.2d 533, 546, 973 P.2d 1049 (1999) (quoting State v. Henderson, 114 Wn.2d 867, 870, 792 P.2d 514 (1990)).

[77] Peters, 163 Wn. App. at 844.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Ramos next argues that his defense counsel's failure to research the relevant law and consequent proposal of an improper jury instruction for first degree manslaughter resulted in ineffective assistance of counsel and requires reversal. We agree.

To prevail on a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance fell below an objective standard of reasonableness based on consideration of all circumstances and that the deficient performance prejudiced the trial.[78] The reasonableness inquiry presumes effective representation and requires the defendant to show the absence of legitimate strategic or tactical reasons for the challenged conduct.[79] In order to show prejudice, the defendant must prove that, but for the deficient performance, there is a reasonable probability that the outcome would have been different.[80]

A claim of ineffective assistance of counsel presents a mixed question of fact and law that an appellate court reviews de novo.[81]

Here, the State does not dispute that Ramos's lawyer's performance was deficient. "Both <u>Gamble</u> and the comment regarding the WPIC were published

---

[78] <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); <u>State v. Nichols</u>, 161 Wn.2d 1, 8, 162 P.3d 1122 (2007).

[79] <u>State v. McFarland</u>, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995).

[80] <u>In re Pers. Restraint of Pirtle</u>, 136 Wn.2d 467, 487, 965 P.2d 593 (1998).

[81] <u>State v. Sutherby</u>, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

before [the 2011 trial]. Therefore, it was deficient performance for Ramos's lawyers to propose the standard version of WPIC 10.03 instead of drafting the instruction in accordance with Gamble and the WPIC comment."[82]

The State argues that Ramos's counsel's deficient performance was not prejudicial. We disagree.

In convicting Ramos of first degree manslaughter here, the jury concluded that Ramos knew of and disregarded the substantial risk that a wrongful *act* would occur. It did not consider whether he disregarded the substantial risk that *death* would occur. As Ramos notes, it takes much less to disregard a substantial risk of any wrongful act than it does to disregard a substantial risk of death. Therein lies the consequence of the instructional error.

At trial, the State presented evidence to show that (1) Ramos and Medina agreed to go to Motel 6 to confront Collins; (2) Ramos changed clothes before going to the hotel; (3) one of the men took a gun, ammunition, and other weapon supplies with them to the motel; (4) at least some of these supplies had been purchased at Camp Pendleton, where Ramos was stationed when he was in the Marines; (5) Ramos drove to the motel; (6) when Ramos and Medina arrived, they started looking around the motel for Collins; (7) together, they knocked on Collins's apartment door; (8) either Medina or Ramos shot Collins; (9) the pair then ran from Motel 6; (10) Ramos lied to a witness the night of the shooting and later to police officers about his presence at the motel. Later that night at a

---

[82] Brief of Respondent at 14.

friend's apartment, Ramos asked "What should I do?" When he learned that Medina had confessed, he became visibly angry.

As the State recognizes, because the jury convicted Medina of second degree murder, it appears that they concluded that Medina was the shooter. Given this conclusion and the above evidence presented at trial, there is a reasonable probability that, but for his attorney's deficient performance, the jury would not have convicted Ramos of first degree manslaughter. The jury appears to have believed Medina's confession, in which he claimed that he alone obtained Ramos's gun from his closet. And the above evidence does not demonstrate a reasonable probability that a jury would have found Ramos acted recklessly, if recklessly had been properly defined. The State presented no evidence that demonstrated that Ramos disregarded a substantial risk of death— the jury's determination would indicate that they accepted that Ramos did not know of Medina's plan to murder Collins. Thus, Ramos's counsel was both deficient and his deficient performance was prejudicial. Consequently, Ramos's conviction must be reversed.[83]

The State argues that, given the evidence it presented at trial, "Ramos cannot demonstrate that there is a reasonable probability that the jury's verdict would have been different if the instruction" had been proper. But, as explained above, the evidence was not overwhelming. The evidence presented by the State demonstrates that Ramos may have had knowledge when he drove to

---

[83] Strickland, 466 U.S. at 694; State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

Motel 6 that there was a substantial risk that a wrongful *act* could occur. But the evidence did not overwhelmingly demonstrate he knew of a substantial risk of *death* occurring.

Reversal of the conviction is the proper remedy for counsel's deficient performance in proposing an improper instruction.

## STATEMENT OF ADDITIONAL GROUNDS

Ramos submitted a statement of additional grounds for review. His arguments, which focus on the first degree manslaughter instructional error and consequent relief of the State's burden of proof, are adequately addressed in his appellate counsel's brief. We will not separately discuss this again.

We affirm Medina's conviction and sentence. We reverse Ramos's conviction and remand for a new trial.

Cox, J.

WE CONCUR: