[No. 64568-4-I.   Division One.   September 19, 2011.]

THE STATE OF WASHINGTON, *Respondent*, v. RICHARD D. PETERS, *Appellant*.

*Lila J. Silverstein* (of *Washington Appellate Project*), for appellant.

*Mark K. Roe, Prosecuting Attorney,* and *Thomas M. Curtis, Deputy,* for respondent.

¶1 SCHINDLER, J. — The State charged Richard Peters with felony murder in the second degree of his six-year-old daughter, S.P., based on the predicate offense of assault, and manslaughter in the first degree with a firearm. The court also instructed the jury on the lesser-included offense of manslaughter in the second degree. The jury found Peters not guilty of felony murder but guilty of manslaughter in the first degree. Contrary to *State v. Gamble*, 154 Wn.2d 457, 114 P.3d 646 (2005) and 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 10.03 (3d ed. 2008) (WPIC), the trial court erroneously in-

structed the jury that in order to convict Peters of manslaughter in the first degree, the State need only prove that he knew of and disregarded "a substantial risk that a wrongful act may occur," rather than "a substantial risk that death may occur." Because the erroneous jury instruction was not harmless beyond a reasonable doubt, we reverse and remand for a new trial.

## FACTS

¶2 Following his service in the navy, Richard Peters worked for Boeing. In 2008, 43-year-old Peters lived in Marysville with his spouse, Kristina,[1] and their three children, eight-year-old G.P., six-year-old S.P., and three-year-old Q.P. Peters and Kristina owned a number of guns and would go target shooting with friends. Peters said that he grew up using guns and believed it was important to teach his children about guns and gun safety. Except for the Colt Double Eagle .45 caliber semiautomatic handgun that he kept on the nightstand in his bedroom, and the 9 mm gun Kristina kept in the kitchen, Peters stored the other guns in a gun safe.

¶3 On November 16, Peters and Kristina spent the day at home with the children. That afternoon, Peters played with the children outside. Later in the day, Peters and S.P. watched *The Wizard of Oz* on the television in the family room downstairs. Kristina said that while talking on the phone, she saw S.P. walk past her on the way to the family room carrying a handgun. A few moments later, Kristina heard a loud bang and Peters screaming to call 911.

¶4 When the medics and police arrived, S.P. was lying on the floor with a gunshot wound through her forehead and was not breathing. After successfully reviving her, the medics airlifted S.P. to Harborview Medical Center. While S.P. was being treated at the hospital, the police questioned

---

[1] For clarity, we refer to Richard Peters by last name and Kristina Peters by first name.

Peters. During a lengthy taped interview, Peters described what happened and at times was emotional and distraught.

¶5 Peters told the police that he had talked to his mother on the phone earlier in the day, and told her he was going to give her his Colt .45 after he "put a front s[ight] on it." Peters explained that his mother was "not very strong," but she could easily "pull that slide back" and use the Colt .45. Peters told the police there was a magazine in the Colt .45 but there was never a bullet in the chamber. "There's never nothing in the chamber. . . . That gun that's upstairs . . . is always . . . nothing chambered . . . ever."

¶6 Peters said that while he and S.P. were watching the movie, he asked her to "go up and grab" his Colt .45 from the nightstand in the bedroom and "bring it down." Peters told the police that he had been through a number of gun safety trainings. Peters said that he taught his children about gun safety, and he often asked the children to get his guns for him.

¶7 Instead of bringing down the Colt .45, S.P. "brought down the magazine" for a different gun. Peters said that he told S.P., "[N]o, that's not what I want. I want the gun. And she went back up and brought down the gun." When S.P. returned with the Colt .45, she held the gun by the grip, pointed down. According to Peters, S.P. handed the gun to him and then backed away, laughing. Peters said he was sitting on the couch and S.P. was off to the side, "[p]robably three or four feet" away. Peters told the police that "somehow the trigger was . . . ready to go which it shouldn't a [sic] been." Peters said that when S.P. handed him the gun there must have been a round already chambered, "and the trigger must've been all the way back." Peters said he "didn't even pay attention to it cuz [sic] normally I never . . . I never have the gun racked," and there is "not supposed to be a bullet in [the chamber]." Peters told the police, "[M]y daughter should never have got that [gun] for me. . . . I should've got off my lazy ass and got the gun myself."

¶8 Throughout the interview, Peters repeatedly said that he did not know there was a bullet in the chamber and when he barely touched the trigger, the gun fired and shot S.P. in the forehead.

I was stupid. I shouda [sic] known. I pulled the magazine out but then . . . I don't know . . . that trigger on that .45 of mine is a hair trigger and it went off when I touched it. . . . [T]here shouldn't a [sic] been nothing ready . . . nothing in the chamber. . . . I hit the trigger and the trigger is, like I said, it's a hair trigger. . . . If you touch it just a slight bit . . . it's gonna fire. . . . Somehow the trigger was . . . ready to go which [it] shouldn't a [sic] been. . . . And that shot my daughter in the head.

Peters said that immediately after the gun went off, he went over to his daughter.

She fell backwards. Just, just backwards and I didn't know what to think and her face turned blue and I'm sitting there screaming and my wife came down and she freaked out and I didn't know what to do. I had her head and . . . I don't know. I, I lost . . . I, I didn't realize what . . . I, I couldn't . . . I, I'm CPR-trained and I couldn't even function.

¶9 Peters admitted that he had consumed four or five doubles of vodka and Coke that day. Peters said that he was "under the influence" and "should not drive" but denied alcohol affected his ability to handle guns. "[A]lcohol has never really been . . . an issue . . . . I've always handled my guns." During the interview, Peters also described an incident at a pumpkin shoot with some friends in November when he accidentally discharged a shotgun.

¶10 At the end of the interview, the police asked Peters if there was anything else he wanted to add. Peters cried and said, "I just want her back, man." Following the interview, the police drove Peters to the hospital to obtain a blood draw. The blood sample that was taken at approximately 2:30 a.m. showed Peters had a blood alcohol level of 0.11 grams per 100 milliliters.

¶11 During the search of Peters' house, the police found a half-gallon of vodka and a half-case of Diet Coke near the couch in the family room. There was a newly made mixed drink, a .45 caliber Para Ordnance handgun, and a magazine on the table located in front of the couch. The Colt .45 and a magazine were on the couch. The gun safe in the family room contained a number of other guns. The police also found a loaded handgun on a table upstairs. Several hours after the shooting, S.P. died at the hospital.

¶12 The State charged Peters with felony murder in the second degree with a firearm based on assault as the predicate offense, count I, and manslaughter in the first degree with a firearm, count II. As to count I, the State alleged that during the commission of the assault, Peters caused the death of his daughter S.P. As to count II, the State alleged that Peters recklessly caused the death of S.P.

¶13 Before trial, Peters filed a motion in limine to exclude all gun evidence except the Colt .45. Peters argued that the evidence was more prejudicial than probative. Peters also moved to exclude testimony about the accidental discharge of a shotgun at the pumpkin shoot, and the testimony of his neighbor John E. "Jes" Smith that in October, Peters showed him a .45 caliber handgun that was underneath some newspapers on the couch, and Peters asked his son to go to his truck to get a gun.

¶14 The court denied the motion to exclude the evidence. The court ruled:

> This evidence of the defendant having handled a weapon less than two weeks prior to the death of his daughter, in which it's alleged that he was handling a weapon that went off, is directly relevant to his knowledge of a substantial risk. It's hard to conceive of how much more — how other evidence might — could be any more directly relevant to his knowledge. It's a situation . . . that makes it imminently clear that [Peters] knew that in the handling of a gun it could go off even if you didn't intend for it to. So it is highly relevant.
>
> . . . .

With regard to the guns in this case, particularly the method of handling the weapon or weapons in the home, seems to me to be directly relevant to the issue of recklessness. The defendant's disregard of the — of a known risk.

. . . .

The probative value of this evidence outweighs any prejudicial effect that it might have, and the weapons will be allowed in.[2]

¶15 The fire fighters, medics, and police who responded to the 911 call, as well as the police detectives, Peters' neighbor Smith, and a co-worker testified at trial. Smith said that when he saw Peters the night of the shooting, he appeared "inebriated" but was "in shock" and "extremely upset." Smith also testified that he had previously expressed to Peters that he was concerned about the guns Peters kept in the house.[3] Deputy Sherriff Brock Adams also testified that when he talked to Peters the night of the shooting, "[h]is eyes were red and watery. He had slurred speech. I could smell the intoxicant." Peters' co-worker, George Wilson, testified about the incident at the pumpkin shoot in November.

¶16 The State also called a doctor with a specialty in forensic pathology, a forensic toxicologist, and a firearms expert to testify at trial. The State presented evidence

---

[2] The trial court also ruled:

It would not be appropriate for anyone to argue, and the Court will not allow anybody to argue or suggest, that because the defendant is a gun owner and because he has multiple weapons in his home, he is somehow or other a bad person or that the ownership of the weapons is bad. He has a constitutional right pursuant to a recent United States Supreme Court case to have guns.

But that doesn't mean that the State can't bring into evidence the fact that he has them, where they are and how he handled them. That, again, goes directly to the issue of recklessness, and directly to the issue of the defendant's disregard of this risk that a bad act could occur.

[3] Smith testified:

I expressed my concern that these — the weapons were loaded and they could possibly, you know, handle them or fire them. I don't remember — recall my exact wording. But I expressed my concern to him. And he told me that all the kids had been taught not to touch these weapons.

about the trajectory of the bullet in an attempt to show S.P. was not off to the side but was standing in front of Peters. The court also admitted Peters' tape-recorded interview with the detectives into evidence. The State provided the jury with a 34-page transcript and played the 40-minute tape recording to the jury. The police detectives testified that contrary to Peters' assertion that he removed the magazine from the Colt .45, the evidence showed Peters did not remove the magazine. Family members and friends testified on behalf of Peters, describing him as "devastated." Peters did not testify.

¶17 At the conclusion of the evidence, the defense requested the court instruct the jury on the lesser-included offense of manslaughter in the second degree.[4] To convict Peters of manslaughter in the second degree, the State has the burden of proving that he acted with criminal negligence, and that he was not aware of the risk of death but should have been aware of it. The State did not object to giving instructions on the lesser-included offense of manslaughter in the second degree. The State conceded the evidence supported giving the lesser included offense instructions.

¶18 The instructions proposed by the State on manslaughter in the second degree included a jury instruction that defined "reckless." The proposed instruction states:

A person is reckless or acts recklessly when he *knows of and disregards a substantial risk that death may occur* and this

---

[4] Under former RCW 9A.32.070 (1997):

(1) A person is guilty of manslaughter in the second degree when, with criminal negligence, he causes the death of another person.
(2) Manslaughter in the second degree is a class B felony.

RCW 9A.08.010(1)(d) defines criminal negligence as:

A person is criminally negligent or acts with criminal negligence when he or she fails to be aware of a substantial risk that a wrongful act may occur and his or her failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation.

disregard is a gross deviation from conduct that a reasonable person would exercise in the same situation.[5]

The defense agreed with the proposed instruction. However, the trial court disagreed with giving the proposed instruction defining "reckless." The court stated the WPIC required only "a substantial risk that a wrongful act may occur. . . . [T]he WPIC does not require a substantial risk of death, and neither does the law." Neither the State nor the defense objected to the court's decision to define "reckless" as knowing and disregarding a substantial risk that a wrongful act may occur.[6]

¶19 The court instructed the jury on manslaughter in the first degree and manslaughter in the second degree. Instruction 11 on manslaughter in the first degree states:

To convict the defendant of the crime of manslaughter in the first degree, as alleged in Count II, each of the following

---

[5] (Emphasis added.)

[6]

THE COURT: [Instruction] 11 would be manslaughter 1 elements. . . . [Instruction] 12 would be reckless. . . . Mr. Stern, you were going to perhaps propose some different language other than death?

[STATE]: Exactly.

THE COURT: You know what that might be?

[STATE]: Whatever Mr. Fine advises. I will try to figure that out. I think there is —

THE COURT: Ms. Halverson, you are going to make a note. You obviously [are] going to want to look at it when it gets here. I will tell you that the WPIC itself says a person is reckless or acts recklessly when he or she knows of and disregards substantial risk that a wrongful act may occur. And then it has a place to fill in —

[DEFENSE]: What's the number?

THE COURT: 10.03. And after wrongful act it has a place, fill in more particular description of act, if applicable. So pursuant to the WPIC, wrongful act appears to be fine. In fact, appears to be the suggested language, unless you want to get —

[DEFENSE]: That's fine.

THE COURT: — more specific.

[STATE]: We don't want to do that.

THE COURT: So are you fine with wrongful act?

[DEFENSE]: I am.

THE COURT: Why don't you take out death and put in wrongful act?

elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about the 16th day of November, 2008, the defendant engaged in reckless conduct;

(2) That [S.P.] died as a result of defendant's reckless acts; and

(3) That any of these acts occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

Jury instruction 12 defines "reckless" as follows:

A person is reckless or acts recklessly when he knows of and disregards a substantial risk that *a wrongful act* may occur and this *disregard is a gross deviation from conduct that a reason-able person would exercise in the same situation.*[7]

Jury instructions 13, 14, and 15 address the lesser included offense of manslaughter in the second degree. Instruction 13 states:

The defendant is charged with Manslaughter in the First Degree in Count II. If, after full and careful deliberation on this charge, you are not satisfied beyond a reasonable doubt that the defendant is guilty, then you will consider whether the defendant is guilty of the lesser crime of Manslaughter in the Second Degree.

When a crime has been proved against a person, and there exists a reasonable doubt as to which of two or more degrees that person is guilty, he shall be convicted only of the lowest degree.

---

[7] (Emphasis added.)

Instruction 14 states:

> To convict the defendant of the crime of manslaughter in the second degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about the 16th day of November, 2008, the defendant engaged in criminally negligent conduct;
>
> (2) That [S.P.] died as a result of defendant's negligent acts; and
>
> (3) That any of these acts occurred in the State of Washington.
>
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
>
> On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

Instruction 15 defines criminal negligence as follows:

> A person is criminally negligent or acts with criminal negligence when he or she fails to be aware of a substantial risk that a wrongful act may occur and this failure constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation.
>
> When criminal negligence as to a particular result is required to establish an element of a crime, the element is also established if a person acts intentionally or recklessly as to that result.

¶20 In closing, the State argued that the evidence showed Peters pointed the gun directly at S.P., that he was guilty of felony murder in the second degree based on assault, and that S.P. died as a result of his reckless conduct. The defense argued there was no evidence establishing that Peters pointed the gun at S.P. and Peters was responsible for negligently causing the accidental death of S.P.

¶21 The jury found Peters not guilty of felony murder but guilty of manslaughter in the first degree with a

firearm. With an offender score of zero, the court imposed a standard range sentence. Peters appeals.

## ANALYSIS

*Jury Instruction Defining "Reckless"*

¶22 Peters contends that contrary to the holding in *Gamble* and the WPIC, the trial court improperly instructed the jury that in order to convict on manslaughter in the first degree, the State needed only to prove that he knew of and disregarded a substantial risk that a wrongful act may occur, rather than a substantial risk that death may occur. Peters argues the erroneous instruction violated his due process rights by lowering the State's burden of proving manslaughter in the first degree. We agree.

¶23 Jury instructions must inform the jury that the State bears the burden of proving each essential element of a criminal offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State v. Schulze*, 116 Wn.2d 154, 167-68, 804 P.2d 566 (1991). It is reversible error to "instruct the jury in a manner" that would relieve the State of the burden of proof. *State v. Pirtle*, 127 Wn.2d 628, 656, 904 P.2d 245 (1995). Accordingly, Peters may challenge the jury instruction defining "reckless" for the first time on appeal. RAP 2.5(a)(3). We review alleged errors of law in jury instructions de novo. *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006).

¶24 Under former RCW 9A.32.060(1)(a) (1997), a person is guilty of manslaughter in the first degree if "[h]e *recklessly causes the death* of another person."[8] RCW 9A.08.010(1)(c) defines "recklessness":

> A person is reckless or acts recklessly when he or she knows of and disregards a substantial risk that a wrongful act may occur and his or her disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation.

---

[8] (Emphasis added.)

¶25 In *Gamble*, the court addressed the reckless element of manslaughter in the first degree in the context of analyzing whether manslaughter in the first degree is a lesser-included offense of felony murder in the second degree based on the predicate offense of assault. *Gamble*, 154 Wn.2d at 462. The court held that manslaughter is not a lesser-included offense of felony murder. *Gamble*, 154 Wn.2d at 468.

> [T]o prove manslaughter the State must show Gamble "[knew] of and disregard[ed] a substantial risk that a [*homicide*] may occur." [RCW 9A.08.010(1)(c)]. On the contrary, to achieve a felony murder conviction here, the State was required to prove only that Gamble acted intentionally and "disregard[ed] a substantial risk that [*substantial bodily harm*] may occur." *Id.* Significantly, the risk contemplated per the assault statute is of "substantial bodily harm," not a homicide as required by the manslaughter statute. As such, first degree manslaughter requires proof of an element that does not exist in the second degree felony murder charge.

*Gamble*, 154 Wn.2d at 467-68 (some alterations in original). In distinguishing the elements of the two crimes and the State's burden of proof, the court held that the "wrongful act" for purposes of manslaughter in the first degree requires the State to prove beyond a reasonable doubt that the defendant knew of and disregarded a substantial risk that death may occur. *Gamble*, 154 Wn.2d at 467-68.

> Looking to the "wrongful act" caused by a defendant's actions, to prove manslaughter the State must show Gamble "[knew] of and disregard[ed] a substantial risk that a [homicide] may occur."

*Gamble*, 154 Wn.2d at 467-68 (emphasis omitted) (alterations in original) (quoting RCW 9A.08.010(1)(c)). As the court notes, "recklessly causing a death and recklessly causing [a wrongful act] are not synonymous." *Gamble*, 154 Wn.2d at 468 n.8.

¶26 Following the Supreme Court's decision in *Gamble*, the Washington Supreme Court Committee on Jury Instruc-

tions revised the definition of "recklessness." As amended, WPIC 10.03 makes clear that the mens rea instruction defining reckless for manslaughter in the first degree must state that the defendant disregarded a substantial risk of death. WPIC 10.03 provides, in pertinent part:

### RECKLESSNESS—DEFINITION

A person is reckless or acts recklessly when he or she knows of and disregards a substantial risk that a [wrongful act] [(fill in more particular description of act, if applicable)] may occur and this disregard is a gross deviation from conduct that a reasonable person would exercise in the same situation.

[When recklessness [as to a particular [result] [fact]] is required to establish an element of a crime, the element is also established if a person acts [intentionally] [or] [knowingly] [as to that [result] [fact]].]

The Note on Use states:

Use bracketed material as applicable. For a discussion of the first paragraph's bracketed alternatives relating to a wrongful act, see the Comment below.

The Comment states, in pertinent part:

For manslaughter, the definition of recklessness is more particularized than is the general statutory requirement of a substantial risk that a wrongful act may occur. The Supreme Court has held in a manslaughter case that the definition of recklessness requires proof of disregarding a substantial risk that a death, rather than simply a wrongful act, may occur. [*Gamble*], 154 Wn.2d [at] 467-68 . . . (in the context of analyzing whether first degree manslaughter is a lesser included offense of second degree felony murder with assault as the predicate felony). Accordingly, for a manslaughter case, the instruction above should be drafted using the word "death" rather than "wrongful act."

¶27 We hold the jury instruction given in this case that defines "reckless" to mean Peters knew of and disregarded "a

substantial risk that a wrongful act may occur," rather than "a substantial risk that death may occur," is contrary to *Gamble* and WPIC 10.03. The instruction impermissibly relieved the State of the burden of proving beyond a reasonable doubt that Peters knew of and disregarded a substantial risk that death may occur, and allowed the jury to convict Peters of only a wrongful act.

*Harmless Error*

¶28 An erroneous jury instruction that misstates the law is subject to a harmless error analysis. *State v. Thomas*, 150 Wn.2d 821, 844, 83 P.3d 970 (2004). A misstatement of the law in a jury instruction is harmless if the element is supported by uncontroverted evidence. *State v. Brown*, 147 Wn.2d 330, 341, 58 P.3d 889 (2002) (citing *Neder v. United States*, 527 U.S. 1, 15, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)). In order to determine whether the error is harmless, we must " 'conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error.' " *Brown*, 147 Wn.2d at 341 (quoting *Neder*, 527 U.S. at 19). The State bears the burden of showing that the error is harmless beyond a reasonable doubt. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986); *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985).

¶29 Here, the uncontroverted evidence does not establish that Peters knew of and disregarded a substantial risk that death may occur, and the State conceded that the evidence at trial supported instructing the jury on the lesser-included offense of manslaughter in the second degree. Peters denied pointing the gun at S.P. and said she was off to the side, three or four feet away. Throughout the interview with the police, Peters repeatedly stated he did not know there was a bullet in the chamber of the Colt .45 and he did not know that the gun was ready to discharge.

> I never . . . leave a round chambered. . . . I have no idea but . . . there's no way you can touch it and make it fire like it did. . . .

The trigger must've been all the way back. . . . [S]omehow the trigger was . . . ready to go which [it] shouldn't a [sic] been. . . . I took the magazine out and it went off. It just . . . it shot. . . . [T]hen I hit the trigger and the trigger is, like I said, it's a hair trigger. . . . [T]he only gun I, I have one gun that I leave a round chambered and that's in my safe.

¶30 Further, in closing argument, the State expressly relied on the erroneous definition of "reckless" in instruction 12 to argue that "reckless" meant that Peters knew "something really bad could happen."

[S.P.] died as a result of the defendant's reckless conduct: . . . he in fact engaged in reckless conduct. What is reckless conduct? What does it mean in this room? On the next page, we tell you. In Instruction Number 12, we tell you what reckless conduct means. We tell you that a person is reckless or acts recklessly when he knows of and disregards a substantial risk that a wrongful act will happen. He knows that something really bad could happen, a substantial risk that a wrongful act will occur, and that this disregard is a gross deviation from the conduct that a reasonable person would exercise.

Now, later on — excuse me for skipping around — we describe negligence: and the only difference between the two is, the reckless says he knows of and disregards a substantial risk; and negligence says he fails to be aware of a substantial risk. In both, the disregard is a gross deviation.

¶31 The State has not carried its burden of showing that the error was harmless. It is not clear beyond a reasonable doubt that the outcome of the trial would have been the same absent the erroneous jury instruction. Because the erroneous jury instruction defining "recklessness" relieved the State of its burden of proof and the instruction is not

harmless beyond a reasonable doubt, we reverse and remand for a new trial.[9]

BECKER and APPELWICK, JJ., concur.

Reconsideration denied November 21, 2011.

---

[9] Because we conclude that the court erred in instructing the jury on the mens rea definition of "recklessness" and remand for a new trial, we need not address Peters' argument that his attorney provided ineffective assistance of counsel and the court erred in admitting gun evidence. Nonetheless, we note that while an individual has the right to possess guns, relevant evidence concerning the use of guns may be admissible. *State v. Hancock*, 109 Wn.2d 760, 767-68, 748 P.2d 611 (1988).