# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| STATE OF WASHINGTON, | ) | |
|---|---|---|
| | ) | No. 65576-1-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| SERGIO GONZALEZ-GUZMAN, | ) | |
| | ) | |
| Appellant. | ) | FILED: December 16, 2013 |
| | ) | |

APPELWICK, J. — Gonzalez-Guzman was convicted of first degree assault of a child. He appeals his conviction, alleging multiple errors: the trial court improperly denied his request for self-representation or new counsel; the prosecutor committed misconduct; the jury instructions on recklessness and reasonable doubt were improper; and the trial court abused its discretion when imposing a lifetime no-contact order between him and the victim. We affirm.

## FACTS

On November 10, 2007, Sergio Gonzalez-Guzman realized that his 10 week old son, D.G., would not wake up or eat, and his eyes were rolling in the back of his head. The child's mother, Crystal Gonzalez, took D.G. to the hospital.[1] D.G. had suffered trauma to his head, ribs, and leg. The next day, Gonzalez-Guzman told a detective that he had slipped while D.G. was in his arms and fallen on top of the child. Gonzalez-Guzman and Crystal married on November 12.

Gonzalez-Guzman was charged with first degree assault of a child. He did not testify at trial, although his statement to the detective was introduced as evidence.

---

[1] For purposes of clarity, the defendant will be referred to by his last name, Gonzalez-Guzman, but his wife and son will be referred to as Crystal and D.G., respectively. No disrespect is intended.

Crystal did testify. She explained that the night before she took D.G. to the hospital, she spent most of her time at a friend's house and a bowling alley. Gonzalez-Guzman had been with D.G.

Numerous doctors testified about the severity of D.G.'s injuries and the extent of trauma required to inflict that much harm. Ultimately, the medical testimony suggested that D.G.'s injuries were nonaccidental and were consistent with shaken baby syndrome. The jury found Gonzalez-Guzman guilty as charged.

He appeals his conviction.

## DISCUSSION

I. Request for Self-Representation or New Counsel

Gonzalez-Guzman contends that he unequivocally invoked his right to self-representation and subsequently requested new counsel with whom he could better communicate. He maintains that the court failed to sufficiently inquire into these statements.

Gonzalez-Guzman's requests proceeded as follows:

> [DEFENSE COUNSEL]: Your Honor, Mr. Gonzalez-Guzman wishes to terminate my representation today. He feels as if he would have easier communication with someone who is a native Spanish speaker. . . . And it's based on that reason that he wishes to terminate my representation.
> THE COURT: So you want to represent yourself in trial?
> [GONZALEZ-GUZMAN]: I want to represent myself while we're in trial.
> THE COURT: What do you propose that we do?
> [GONZALEZ-GUZMAN]: I would like to have a lawyer that speaks my same language.
> THE COURT: Do you have one here? I don't see anyone in the courtroom.
> [GONZALEZ-GUZMAN]: To understand better.

THE COURT: Do you have anyone here? I don't see anyone in the courtroom that could do that.

[GONZALEZ-GUZMAN]: No, I have no one here right now.

THE COURT: Who's the attorney that you're proposing is going to be prepared to try this case today for you?

[GONZALEZ-GUZMAN]: Right now? I don't have him yet.

THE COURT: Well, we're in trial; and how long has this attorney been representing you?

[GONZALEZ-GUZMAN]: I don't remember exactly.

[PROSECUTION]: Since February 28th of 2008.

THE COURT: Since February of 2008?

[PROSECUTION]: Yes, Your Honor.

THE COURT: And how many times have you asked the Court to appoint someone who speaks fluent Spanish?

[GONZALEZ-GUZMAN]: I have never asked.

THE COURT: All right. And I don't know of any way, or of any right to have that. And you're ready to go to trial today, right?

[DEFENSE COUNSEL]: I am, Your Honor.

[PROSECUTION]: Your motion is denied.

[GONZALEZ-GUZMAN]: Thank you.

Gonzalez-Guzman did not raise either issue again until his appeal.

## A. Request for Self-Representation

Criminal defendants have an explicit right to self-representation under the Washington Constitution. Wash. Const. art. I, § 22; State v. Madsen, 168 Wn.2d 496, 503, 229 P.3d 714 (2010). We review denials of requests for pro se status for abuse of discretion. Madsen, 168 Wn.2d at 504. Discretion is abused if a decision is manifestly unreasonable or rests on facts unsupported by the record or was reached by applying the wrong standard. Id. The unjustified denial of the right to self-representation requires reversal. Id. at 503.

Gonzalez-Guzman alleges that the trial court impermissibly ignored his pro se request. When a defendant requests pro se status, the trial court must first determine whether the request is unequivocal and timely. Id. at 504. The request must be unequivocal in the context of the record as a whole. State v. Stenson, 132 Wn.2d 668,

3

741-42, 940 P.2d 1239 (1997). The court must indulge in every reasonable presumption against the defendant's waiver of right to counsel. In re Det. of Turay, 139 Wn.2d 379, 396, 986 P.2d 790 (1999). However, this presumption does not eliminate the need for an identifiable basis for denying a motion for pro se status. Madsen, 168 Wn.2d at 505.

Gonzalez-Guzman contends that the court failed to follow up on his demand to proceed pro se. However, this overlooks an important exchange following his request, wherein the court asked Gonzalez-Guzman, "What do you propose that we do?" Gonzalez-Guzman responded that he would like to have a lawyer that speaks his language, indicating that obtaining new counsel was his actual concern. This put into question whether his request was unequivocal.

A pro se request made in the context of expressing displeasure with one's counsel often indicates that the request is equivocal. See, e.g., State v. Woods, 143 Wn.2d 561, 587, 23 P.3d 1046 (2001). In Woods, the defendant stated that:

> I will be prepared to proceed with—with this matter here without counsel come October. . . .
>
> . . . I've—I've already consented to one continuance, Your Honor. And they—they have done nothing but grossly misuse that there. And I feel if—if they was [sic] granted a second continuance, it—it would be treated in the same manner, Your Honor.

Id. at 587. This was not an unequivocal request, but an expression of the defendant's displeasure with his counsels' motion to continue his trial. Id.

An alternative request for new counsel does not automatically render a pro se request equivocal. See Madsen, 168 Wn.2d at 507. In Madsen, the defendant

requested to proceed pro se, or alternatively, to fire his attorney. Id. 506-07. The court found his request unequivocal, because the defendant twice clearly stated that he would represent himself and even cited the Washington Constitution provision that gave him that right. Id. at 501-03. Conversely, in Turay, the defendant's pro se request was a third choice after the court either appointing the attorney of his choice or ordering his current counsel to remain. 139 Wn.2d at 398. Applying the presumption against waiver of right to counsel, the court found Turay's request equivocal. Id. at 399.

Gonzalez-Guzman's request was likewise equivocal. Viewed alone, his statement that "I want to represent myself while we're in trial" is more unwavering than those in Woods. But, the overall purpose of his exchange with the court was to obtain new counsel, and he never elaborated on or renewed his request to be pro se. His statement lacked the conviction and certainty of that in Madsen. Considering Gonzalez-Guzman's statement in context and applying the presumption against waiver of right to counsel, his request was equivocal. The trial court did not abuse its discretion.

B. Request for New Counsel

Gonzalez-Guzman contends that, because of the language barrier, he could not effectively communicate with his lawyer. He argues that the trial court impermissibly dismissed his request for new counsel.

When an attorney-client relationship completely collapses, the refusal to substitute new counsel violates the defendant's right to effective assistance. State v. Cross, 156 Wn.2d 580, 606, 132 P.3d 80 (2006). We review a trial court's refusal to appoint new counsel for abuse of discretion. Id. at 607. The factors to consider are (1) the extent of the conflict, (2) the adequacy of the trial court's inquiry, and (3) the

5

timeliness of the motion. <u>In re Pers. Restraint of Stenson</u>, 142 Wn.2d 710, 724, 16 P.3d 1 (2001) (adopting the test set out in <u>United States v. Moore</u>, 159 F.3d 1154, 1158-59 (9th Cir. 1998)).

We first consider the extent and nature of the attorney-client conflict. <u>Moore</u>, 159 F.3d at 1158-59. To warrant substitution of counsel, there must be good cause, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication. <u>State v. Thompson</u>, 169 Wn. App. 436, 457, 290 P.3d 996 (2012), <u>review denied</u>, 176 Wn.2d 1023, 299 P.3d 1172 (2013). The breakdown must prohibit the lawyer from providing effective assistance. For example, in <u>Thompson</u>, the court found no good cause for a substitution where the defendant verbally abused and threatened his lawyer, but counsel continued to attempt to communicate. <u>Id.</u> at 457-58. By contrast, courts have found that new counsel was required in situations where the breakdown resulted from counsel's bad acts. <u>See, e.g.</u>, <u>Frazer v. United States</u>, 18 F.3d 778, 783 (9th Cir. 1994) (counsel used racial slurs and threatened to provide substandard performance); <u>United States v. Moore</u>, 159 F.3d 1154, 1159 (9th Cir. 1998) (counsel failed to inform defendant of an important plea deal development); <u>United States v. Williams</u>, 594 F.2d 1258, 1260 (9th Cir. 1979) (counsel and defendant had a "stormy" relationship with quarrels, bad language, exchange of threats).

Gonzalez-Guzman's request was for "a lawyer that speaks [his] same language" so that he can "understand better." Interpreters assisted communication between Gonzalez-Guzman and his attorney. Gonzalez-Guzman has not established that he has the right to an attorney fluent in his own language. Nor does he present any other

evidence that his attorney was ineffective or that there was a complete breakdown in communication.

Second, we examine the adequacy of the trial court's inquiry. Moore, 159 F.3d at 1160. A trial court's inquiry is sufficiently searching where a defendant is allowed to express his concerns and present all vital information. See Stenson, 142 Wn.2d at 731.

Here, the trial court asked Gonzalez-Guzman why he desired new counsel, who he proposed would represent him, and whether he had previously requested new counsel. Gonzalez-Guzman relies on United States v. Adelzo-Gonzalez, 268 F.3d 772. 777-78 (9th Cir. 2001), and United States v. Nguyen, 262 F.3d 998, 1004-05 (9th Cir. 2001), to argue that this inquiry was insufficient. However, those cases involved interpersonal disputes between counsel and client, for which more in-depth inquiry was necessary. See Adelzo-Gonzalez, 268 F.3d at 775; Nguyen, 262 F.3d at 1001. Gonzalez-Guzman's motion asserted only that he wanted a fluent Spanish speaker, which the trial court was able to discern and used its discretion to dismiss.

Finally, we evaluate the timeliness of the defendant's motion. Moore, 159 F.3d at 1161. The court must balance the inconvenience and delay of substituting counsel against the defendant's important constitutional right to counsel of his choice. Id. But, where the request comes during trial or on the eve of trial, the court may refuse to delay the trial to obtain new counsel. Stenson, 142 Wn.2d at 732. In Moore, the court found the defendant's motions timely when he made several attempts to substitute counsel, spanning over a month before trial. 159 F.3d at 1161. In Stenson, the court denied the defendant's motion where current counsel already spent 21 days on jury selection and new counsel would need 30 days to prepare. 142 Wn.2d at 732.

Gonzalez-Guzman did not move for new counsel until pretrial proceedings, although his attorney had represented him for over a year at that point. He did not have new counsel ready or a proposal for replacement counsel. The trial court did not abuse its discretion in denying his request.

II. Prosecutorial Misconduct

Gonzalez-Guzman alleges multiple instances of prosecutorial misconduct. Prosecutorial misconduct is grounds for reversal where the conduct is both improper and prejudicial. State v. Monday, 171 Wn.2d 667, 675, 257 P.3d 551 (2011). This court determines the effect of a prosecutor's improper conduct in the context of the full trial. State v. McKenzie, 157 Wn.2d 44, 52, 134 P.3d 221 (2006). Generally, a prosecutor's comments are prejudicial only where there is a substantial likelihood that they affected the jury's verdict. Monday, 171 Wn.2d at 675.

A. Comments on testimonial silence

Gonzalez-Guzman argues that the prosecutor's comments on his failure to testify were an improper implication of guilt. The Fifth Amendment forbids comment by the prosecution on a defendant's refusal to testify. Griffin v. California, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965). A prosecutor's statement is improper if it was of such character that the jury would naturally and necessarily accept it as a comment on the defendant's failure to testify. State v. Ramirez, 49 Wn. App. 332, 336, 742 P.2d 726 (1987).

In Ramirez, the prosecutor commented that: "'She [defense counsel] lists several hypothetical questions and hypothetical situations why a person does not want to testify. . . . She left out one reason, a hypothetical reason and the only other

hypothetical reason she left out is a person is guilty.'" Id. at 336-37 (emphasis omitted (alteration in original). The court found the comments improper, because they would naturally and necessarily lead the jury to focus on the defendant's failure to testify. Id. at 337. In State v. Crawford, the prosecutor referred in general terms to "'undisputed'" and "'unrefuted'" evidence. 21 Wn. App. 146, 151, 584 P.2d 442 (1978). This was permissible, because the statements were subtle and brief enough that they did not improperly emphasize the defendant's testimonial silence. Id. at 152.

Gonzalez-Guzman contends that the prosecutor improperly commented on his failure to testify by emphasizing Crystal's testimony and Gonzalez-Guzman's earlier statement to the detective. In closing, the prosecutor told the jury that "at best, in a case like this, you're going to get medicals and you're going to get two sides to a story, and that's what you got." He then addressed Crystal's testimony, stating that "[s]he got up here on the stand, under oath, told you, looked you in the eyes. . . . You have undisputed evidence from her that it wasn't her." He continued that "[Crystal's testimony] is enough. Even if we didn't have the Defendant's story or supposed story." Then, he moved to Gonzalez-Guzman's statement, saying "But you have more. . . . You have [the Defendant's] statement to Detective Thomas, and the only thing we can do is analyze that statement at this point." Finally, he noted that Gonzalez-Guzman's statement was "a little too early" and "premature" to properly account for all of D.G.'s injuries.

These were not improper comments on Gonzalez-Guzman's failure to testify. First, the prosecutor's remarks that the jury had his side of the story accurately reflected the record: Detective Thomas testified about Gonzalez-Guzman's statement. Second,

9

the emphasis on Crystal's testimony was not a comment on his failure to testify. Her testimony was that she did not have control of D.G. when he was hurt. This was necessary to rebut the defense's theory that Crystal was actually the abuser. Finally, the prosecutor's comments that Gonzalez-Guzman's statement was "premature" and that "the only thing we can do is analyze that statement" focused on the fact that his statement was inconsistent with the other evidence. The contested comments did not naturally and necessarily lead the jury to focus on the defendant's testimonial silence.

B. <u>Shift of burden of proof</u>

Gonzalez-Guzman contends that the prosecutor improperly shifted the burden of proof by emphasizing Crystal's testimony and contrasting it with Gonzalez-Guzman's silence. It is flagrant misconduct for a prosecutor to shift the burden of proof to a defendant. <u>State v. Miles</u>, 139 Wn. App. 879, 890, 162 P.3d 1169 (2007). Accordingly, a prosecutor generally cannot comment on the defendant's failure to present evidence, because the defendant has no duty to do so. <u>State v. Thorgerson</u>, 172 Wn.2d 438, 453, 258 P.3d 43 (2011). Prosecutors have wide latitude to make inferences about witness credibility. <u>Id.</u> But, it is error for a prosecutor to offer the "false choice" that the jury can find a defendant not guilty only if it believes his evidence. <u>Miles</u>, 139 Wn. App. at 890.

Gonzalez-Guzman argues that the prosecutor improperly suggested that he failed to discredit Crystal or to present other evidence on his own behalf. As discussed above, the challenged statements about Crystal's story being "undisputed," "enough," and "under oath" were in the context of a discussion of exclusive control. The prosecutor was instructing the jury that, if they believed Crystal, they could find that Gonzalez-Guzman had exclusive control of D.G. that night. This did not create a false choice for

the jury to either convict Gonzalez-Guzman or disbelieve Crystal. The prosecutor did not place an improper burden on Gonzalez-Guzman.

C. Speculation

Gonzalez-Guzman contests the prosecutor's speculation about his motive for marrying Crystal two days after D.G.'s injury. A prosecutor has wide latitude to argue reasonable inferences from the evidence. Thorgerson, 172 Wn.2d at 448. Statements not sustained by the record are improper. State v. Dhaliwal, 150 Wn.2d 559, 577, 79 P.3d 432 (2003).

In State v. Hoffman, the defendant challenged the prosecutor's statement that "'what happened to this gun is that Hoffman knew a police officer had been shot with it and he took it up in the hills and got rid of if it. He hid it where nobody would ever find it.'" 116 Wn.2d 51, 94, 804 P.2d 577 (1991). The evidence demonstrated that Hoffman admitted the gun was at the scene, the gun was never found after an exhaustive search of the area, and Hoffman admitted to a witness that he had disposed of the gun. Id. The court found the prosecutor's inference reasonable. Id.

Here, the prosecutor stated in his closing that Gonzalez-Guzman married Crystal because he "feels guilty about this because he is guilty. He's guilty for ruining [D.G.]'s life." Later, he reiterated the point, saying that Gonzalez-Guzman "probably gave [Crystal] something that she wanted, to make her happy, to make up for what he did wrong, to make up for what he did to [D.G.]."

The State maintains that these are reasonable inferences from the fact that the couple got married only two days after D.G.'s hospitalization, and that they lived together prior to that. But, there was no testimony or evidence presented about why the

couple got married. In fact, when the prosecutor tried to elicit testimony from Crystal on this point, the court sustained an objection as to its relevance. The prosecutor's comments in closing lack sufficient support in the record. These statements were improper.

However, Gonzalez-Guzman did not object to the closing remarks at trial. Where a defendant fails to object to improper prosecutorial conduct, the error is waived unless the conduct was so flagrant and ill-intentioned that it creates an enduring prejudice that could not have been neutralized by a curative instruction. State v. Brown, 132 Wn.2d 529, 568, 940 P.2d 546 (1997). For example, in State v. Belgarde, the court found that a curative instruction would have been ineffective where the prosecutor described members of the American Indian Movement as "a deadly group of madmen," "militant," and "butchers, that killed indiscriminately Whites and their own." 110 Wn.2d 504, 506-07, 755 P.2d 174 (1988) (emphasis omitted). By contrast, in McKenzie, there was no enduring prejudice where the prosecutor emphasized the victim's "lost innocence" in response to defense counsel's comment that the defendant would have to settle for the words "not guilty" instead of "innocent." 157 Wn.2d at 60. The court acknowledged the prosecutor went "too far in her effort to exploit defense counsel's theme," but that it was not so flagrant and ill-intentioned that it could not have been cured. Id.

The statements here do not rise to the inflammatory level of those in Belgarde. As in McKenzie, the prosecutor went too far in exploring a theme. But, his statements were not so flagrant and ill-intentioned as to be incurable.

III.    Recklessness Instruction

Gonzalez-Guzman argues that the trial court improperly instructed the jury on recklessness.  We review challenged jury instructions de novo, in the context of the instructions as a whole.  State v. Castillo, 150 Wn. App. 466, 469, 208 P.3d 1201 (2009).  Instructions must convey to the jury that the State bears the burden of proving every essential element of a criminal offense beyond a reasonable doubt.  State v. Bennett, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007).  Instructions must also properly inform the jury about the applicable law and not mislead the jury.  Id.

A.  Mandatory presumption

Gonzalez-Guzman first contends that the recklessness instruction created an improper mandatory presumption.  A mandatory presumption is one that requires a jury "to find a presumed fact from a proven fact."  State v. Deal, 128 Wn.2d 693, 699, 911 P.2d 996 (1996).  Mandatory presumptions violate a defendant's due process right if they relieve the State of its obligation to prove all elements of the charged crime.  Id.

Jury instruction 11, the "to-convict" instruction, enumerated the elements of assault of a child in the first degree:

> (1) That during a time intervening between November 9, 2007 and November 10, 2007, the defendant intentionally assaulted [D.G.] and recklessly inflicted great bodily harm;
> (2) That the defendant was eighteen years of age or older and [D.G.] was under the age of thirteen; and
> (3) That the acts occurred in the State of Washington.

This crime requires two distinct acts with two corresponding mental states: the defendant must (1) intentionally assault and (2) recklessly inflict substantial bodily harm on another.  RCW 9A.36.120; State v. McKague, 159 Wn. App. 489, 509, 246 P.3d 558,

13

aff'd but criticized on other grounds by, 172 Wn.2d 802, 262 P.3d 1255 (2011). Jury instruction 10 defined "recklessness" as follows:

> A person is reckless or acts recklessly when he or she knows of and disregards a substantial risk that a wrongful act may occur and this disregard is a gross deviation from conduct that a reasonable person would exercise in the same situation.
>
> When recklessness is required to establish an element of a crime, the element is also established if a person acts intentionally or knowingly.

(Emphasis added.)

Gonzalez-Guzman's objection lies with the last sentence of instruction 10. He argues that it permits the jury to find that, if Gonzalez-Guzman intentionally assaulted D.G., he must have also recklessly inflicted substantial bodily harm. Gonzalez-Guzman relies on State v. Hayward, a recent Division Two case, to allege that the instruction collapsed the two elements. 152 Wn. App. 632, 217 P.3d 354 (2009). There, the instruction stated that, "'Recklessness also is established if a person acts intentionally.'" 152 Wn. App. at 643. The court found that this conflated the intent regarding the defendant's assault with his intent to cause substantial bodily harm. Id. at 645.

However, Division One addressed this issue after Hayward and reached a different result. See State v. Holzknecht, 157 Wn. App. 754, 238 P.3d 1233 (2010). In Holzknecht, the disputed "recklessness" instruction similarly provided that "'[r]ecklessness is also established if a person acts intentionally or knowingly.'" Id. at 762. This court "respectfully disagree[d]" with Hayward, id. at 765, concluding that the instruction correctly informed the jury of the applicable law. Id. at 766.

Division Two also concluded in a subsequent case that a trial court may avoid the problem in Hayward by giving a "correct" instruction. McKague, 159 Wn. App. at

509. There, the instruction stated that "'[w]hen recklessness as to a particular fact is required to establish <u>an element</u> of a crime, <u>the element</u> is also established if a person acts intentionally or knowingly.'" <u>Id.</u> at 509-10 (emphasis in original). The <u>McKague</u> court held that this cured the defective <u>Hayward</u> instruction by emphasizing the link between the mens rea of recklessness and the result of great bodily harm. <u>Id.</u> at 510.

The instruction in Gonzalez-Guzman's trial satisfies both <u>Holzknecht</u> and <u>McKague</u>. Importantly, it emphasizes that each element must be considered independently by the jury, thereby resolving the ambiguity in <u>Hayward</u>. And, while it lacks the phrase, "as to a particular fact" found in <u>McKague</u>, this omission does not dilute the link between recklessness and the specific element of great bodily harm. The instruction did not create an improper mandatory presumption.

## B. Definition of recklessness

Gonzalez-Guzman also challenges the definition of recklessness as disregard of a "'substantial risk that a <u>wrongful act</u> may occur.'" (Emphasis added.) Instead, he contends that the definition should have read, substantial risk that "substantial bodily harm may occur." He brings this challenge for the first time on appeal.

We may refuse to hear any claim of error that was not raised at trial. RAP 2.5(a). An exception exists for manifest errors affecting a constitutional right. <u>Id.</u> Pursuant to RAP 2.5(a)(3), an appellant must identify an error of truly constitutional dimension and show that it was manifest, i.e., how the error actually affected the appellant's rights at trial. <u>State v. O'Hara</u>, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). If we determine that the claim raises a manifest constitutional error, we then perform a harmless error analysis. <u>State v. Lynn</u>, 67 Wn. App. 339, 345, 835 P.2d 251 (1992).

Gonzalez-Guzman urges us to consider his claim, because the improper definition of recklessness deprived him of a fair trial. Where a jury instruction relieves the State's burden of proving an element of its case, the error is of constitutional magnitude and may therefore be raised for the first time on appeal. See State v. Stein, 144 Wn.2d 236, 240-41, 27 P.3d 184 (2001). If a jury may convict a defendant without finding an essential element of the crime charged, the defendant cannot be said to have a fair trial, and the error is manifest. Id. at 241.

In State v. Peters, this court considered the same recklessness instruction in the context of manslaughter. 163 Wn. App. 836, 845-46, 261 P.3d 199 (2011). We held that the instruction relieved the State of its burden of proving an essential element of the crime, and thus the claim may be heard for the first time on appeal. Id. at 847. Under Peters, the recklessness instruction here constitutes manifest constitutional error.

However, Gonzalez-Guzman's claim is still subject to a harmless error analysis. See Lynn, 67 Wn. App. at 345. In order to determine that an error is harmless, the court must conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error. Peters, 163 Wn. App. at 850. A misstatement of the law in a jury instruction is harmless if the element is supported by uncontroverted evidence. Id.

In Peters, the defendant's mental state as to the precise wrongful act was directly in question. 163 Wn. App. at 849. There, the defendant shot and killed his daughter, but maintained that it was an accident. Id. at 839-40. The recklessness instruction referring to a "wrongful act" was thus prejudicial, because the evidence did not show that the defendant disregarded a substantial risk of death. Id. at 849-50. Furthermore, the prosecutor relied on the erroneous definition to argue that "reckless" meant Peters

16

knew "'something really bad could happen.'" Id. at 851. This relieved the State of its burden of proof, and the error was not harmless. Id. at 851-52

In State v. Harris, this court also reviewed the same instruction scheme in a case involving first degree assault of a child. 164 Wn. App. 377, 384, 263 P.3d 1276 (2011). There, the defendant admitted that he shook the child, id. at 381, but claimed he did not realize he could inflict such severe injury by doing so. Id. at 387. He argued that, therefore, he did not knowingly disregard a substantial risk of great bodily harm. Id. Due to the recklessness instruction that referenced simply "'a wrongful act,'" the defendant was deprived of the opportunity to argue his theory of the case. Id. at 385.

Here, there was no dispute about the degree of the crime, as in Peters. See 163 Wn. App. at 848. There was no assertion that the defendant misunderstood the consequences of his actions, as in Harris. See 164 Wn. App. at 387. Instead, Gonzalez-Guzman's theory was that Crystal inflicted the serious injuries, and any harm caused while D.G. was in his care was accidental. Gonzalez-Guzman argues that his fall with D.G. calls into question his mental state as to the harm inflicted. But, the medical testimony refuted his allegation that D.G.'s injuries were accidental.

The question at trial was thus not the nature of D.G.'s injuries. Rather, the State offered so much evidence of the extent of great bodily harm that it negated Gonzalez-Guzman's accidental fall theory. The medical testimony established not only that the injuries were intentionally inflicted, but also that they were severe. One doctor described D.G.'s injuries as "devastating," the result of a "significant amount of force," and similar to trauma suffered by high speed interstate accident victims. Another testified that D.G.'s leg fracture "implie[d] sort of a torquing movement to break the

bone," and that his broken rib is a "very, very difficult rib to break, so you have to squeeze very high up into the chest." Based on this evidence, the jury could not have misunderstood the link between recklessness and the harm that D.G. suffered.

The recklessness instruction did not deprive Gonzalez-Guzman of an opportunity to argue his case. Nor did it reduce the State's burden of proof. Due to the severity of D.G.'s injuries and the lack of contrary evidence, we conclude that the jury's verdict would have been the same even without the erroneous instruction. The error was harmless.

IV.    Reasonable Doubt Instruction

Gonzalez-Guzman also challenges the reasonable doubt instruction given at his trial. In Bennett, the Washington Supreme Court instructed all trial courts to use 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 4.01 (2d ed. Supp. 2005) (WPIC).on reasonable doubt until it approved a better instruction. 161 Wn.2d at 318. WPIC 4.01 contains the following optional language: "'If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.'"[2] Id. at 308.

Gonzalez-Guzman contests this optional language. He contends that it confused the jury's role, because it impermissibly suggested that the jury's job is to search for the truth.

He relies on two recent cases to support his proposition that the language was improper. First, he points to State v. Emery, where the prosecutor told the jury to

_____

[2] There is now a third edition of the WPICs. 11 WPIC 4.01 (3d ed. Supp. 2011). The relevant language is unchanged from the version mandated by the Bennett court.

"speak the truth by holding these men accountable for what they did." 174 Wn.2d 714, 751, 278 P.3d 653 (2012). The court found the remark improper and explained that the jury's job is to determine <u>not</u> the truth of what happened, but whether the State proved the charged offenses beyond a reasonable doubt. <u>Id.</u> at 760. Similarly, in <u>State v. Berube</u>, the prosecutor asked the jury to "search for the truth, not a [sic] search for reasonable doubt." 171 Wn. App. 103, 120, 286 P.3d 402 (2012), <u>review denied</u>, 178 Wn.2d 1002, 208 P.3d 641 (2013). Again, the court highlighted that "truth is not the jury's job." <u>Id.</u>

The "abiding belief" language in the reasonable doubt instruction is distinguishable from the comments in <u>Emery</u> and <u>Berube</u>. In those cases, the prosecutor told the jury to search out or speak the truth, an onus that misrepresented the job before them. Here, the challenged instruction does not direct jurors to find the truth themselves. It merely elaborates on what it means to be "satisfied beyond a reasonable doubt."

Gonzalez-Guzman also argues that the instruction improperly equated "proof beyond a reasonable doubt" with an "'abiding belief in the truth,'" misstating the prosecution's burden.

Gonzalez-Guzman contends that <u>State v. Pirtle</u> supports his argument, Br. of Appellant, 45, despite the fact that the court upheld the same language he contests. <u>See</u> 127 Wn.2d 628, 658, 904 P.2d 245 (1995). The <u>Pirtle</u> court found that the language was "unnecessary but was not an error." <u>Id.</u> Gonzalez-Guzman maintains that this was "far from an endorsement," and is even less persuasive after <u>Emery</u> and

Berube recognized the "danger of injecting a search for the truth" into the definition of reasonable doubt.

However, multiple cases have upheld the use of this language, finding that it "adequately instructs the jury," State v. Mabry, 51 Wn. App. 24, 25, 751 P.2d 882 (1988), and "could not have misled or confused" it. State v. Price, 33 Wn. App. 472, 476, 655 P.2d 1191 (1982). And, though the Pirtle court questioned its usefulness (notably before the Bennett ruling), it still found that the language did not diminish the definition of the burden of proof. 127 Wn.2d at 658. The instruction was proper.

V.    Lifetime No-Contact Order

Gonzalez-Guzman argues that the lifetime no-contact order between him and his son violates his fundamental right to his parent-child relationship.[3] This court reviews sentencing conditions for abuse of discretion. State v. Warren, 165 Wn.2d 17, 32, 195 P.3d 940 (2008). This remains the standard even where the condition interferes with a fundamental right, such as the relationship between parent and child. In re Pers. Restraint of Rainey, 168 Wn.2d 367, 375, 229 P.3d 686 (2010). However, this court reviews such conditions more carefully to ensure that they are sensitively imposed and reasonably necessary to accomplish the essential needs of the State and public order. Id. at 374. The State has a compelling interest in preventing harm and protecting children. State v. Corbett, 158 Wn. App. 576, 598, 242 P.3d 52 (2010).

---

[3] The State contends that Gonzalez-Guzman has not established that he is D.G.'s father, so the order does not implicate a fundamental right to parent. However, D.G.'s mother testified that Gonzalez-Guzman is D.G.'s father and there is no evidence disputing that fact.

Gonzalez-Guzman contends that a complete prohibition on contact with his son is not reasonably necessary to promote the State's interest. Courts will vacate no-contact orders where they are not sufficiently related to the harm they seek to prevent. For example, in State v. Letourneau, the defendant was sentenced for second degree rape of a child to whom she was not related and subsequently prohibited from unsupervised contact with her children. 100 Wn. App. 424, 426, 997 P.2d 436 (2000). Because there was no evidence that she might molest her own children, the court found that the order was not reasonably necessary to accomplish the needs of the state. Id. at 441-42.

In Rainey, the court approved the scope of a lifetime no-contact order between a father and child, though it ultimately struck the order based on duration. 168 Wn.2d at 382. There, the defendant had kidnapped his daughter and used her to gain leverage over his ex-wife. Id. at 379. The court found that it was proper to issue a no-contact order of some duration, because it was reasonably necessary to prevent the defendant from further harassing his ex-wife. Id. at 380. However, the sentencing court gave no reason for the lifetime duration of the order. Id. at 382. The appellate court thus remanded for the sentencing court to consider the duration of the order under the "reasonably necessary" standard. Id. at 382.

Unlike the children in Rainey or Letourneau, D.G. was the victim of Gonzalez-Guzman's crime: first degree abuse of his son. D.G.'s injuries were severe and numerous, including a serious brain hemorrhage and fractured skull, ribs, and leg. Multiple doctors testified that this level of trauma took a significant amount of force. Moreover, the effect of D.G.'s injuries is long-lasting. One doctor testified that D.G.'s

21

brain disfigurement is permanent and will have a "profound effect" on his development. According to his foster mother's testimony, two-year-old D.G. was still unable to sit up or roll over, had trouble spoon feeding, and moving his limbs, and is blind. This is distinct from Rainey, where the harm was not physical and the primary target of the harm was Rainey's ex-wife, not his daughter. See 168 Wn.2d at 380.

The severity and longevity of D.G.'s injuries support the trial court's discretion to enter a lifetime no-contact order, even between a parent and child.

We affirm.

_Appelwick, J._

WE CONCUR:

_Spearman, A.C.J._

_Cox, J._

22