IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71159-8-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| TAMAS HIBSZKI, | ) | |
| | ) | |
| Appellant. | ) | FILED: April 13, 2015 |

SCHINDLER, J. — A jury convicted Tamas Hibszki of burglary in the second degree and theft in the second degree. Hibszki appeals, arguing he is entitled to reversal of his conviction for burglary in the second degree because insufficient evidence supports finding that he unlawfully entered or remained in a building. Hibszki also challenges the jury instructions on accomplice liability. We affirm.

FACTS

At around 2:30 a.m. on July 26, 2010, Washington Department of Fish and Wildlife Sergeant Erik Olson observed a small boat with two occupants land at a boat launch under the West Seattle Bridge. The boat did not have a visible registration number or navigation lights. Sergeant Olson approached the boat and asked the two occupants for identification. Tamas Hibszki identified himself as the owner of the boat. The passenger identified himself as Justin Michael Stoltman. Sergeant Olson saw "a lot

of cabling that was wound up" and two duffle bags in the bottom of the boat. The duffle bags had "tool[s] sticking out . . . . [B]olt cutters and wire cutters." Hibszki and Stoltman told Sergeant Olson they were "recycling the cabling off abandoned . . . pilings." Based on the description of the pilings, Sergeant Olson called the Port of Seattle Police Department. The Port of Seattle police confiscated the cables but did not arrest Hibszki or Stoltman. Sergeant Olson gave Hibszki and Stoltman "a warning for the registration and the boating safety violations."

At approximately 2:30 a.m. on July 27, Sergeant Olson saw Hibszki and Stoltman on the Duwamish River. As Sergeant Olson pulled his patrol boat up to Hibszki's boat, he observed "a very large metal pipe, really big . . . metal tube or valve that was right in the middle of the boat." Sergeant Olson estimated the pipe valve weighed approximately 35 to 40 pounds. Sergeant Olson questioned Hibszki and Stoltman separately about the valve. Stoltman told Sergeant Olson he did not know where the pipe valve came from and it was "on the boat when they launched." Hibszki claimed "a friend of his gave it to him."

Hibszki and Stoltman agreed to let Sergeant Olson search their duffle bags. Sergeant Olson found seven red valve handles inside Stoltman's duffle bag. Hibszki's bag contained "copper and brass fittings." Sergeant Olson suspected the items had been taken from a larger vessel and confiscated the pipe valve and the two bags. Sergeant Olson released Hibszki and Stoltman but continued to investigate.

Sergeant Olson saw "a very large freighter-type vessel" a couple hundred yards up the Duwamish River that matched the paint color of some of the items seized from Hibszki and Stoltman. Testimony at trial established the vessel was built in 1945 and is

2

approximately 100 feet long and at least 50 feet tall. Several hatches on the vessel were open, and Sergeant Olson said that was "unusual." Sergeant Olson testified that the vessel was "permanently affixed" to pilings in the river, and that he had previously seen several barges carrying "different kinds of products" tied up to the vessel.

Sergeant Olson boarded the vessel and climbed down one of the hatches "into the bowels of the ship." Seven valve handles were missing from the engine manifold in the engine room. The three remaining red handles were identical to the seven handles Sergeant Olson found in Stoltman's duffle bag. Sergeant Olson said it appeared copper and brass fittings and tubing had been recently removed from panels in another room. Sergeant Olson dusted for fingerprints and found a palm print belonging to David Roberts on one of the panels.

The State charged Hibszki and Stoltman by amended information with burglary in the second degree, theft in the second degree, and malicious mischief in the second degree.[1] The State gave Roberts immunity in exchange for his testimony at trial.

A number of witnesses testified during the four-day jury trial, including Sergeant Olson and Roberts. Hibszki denied he was in the vessel and claimed someone else, possibly Roberts, had given him the items to sell.

Vice President of Island Tug and Barge Company, Jonathan Anderson, testified that his company uses the vessel "for our barge storage for . . . our company." Island Tug and Barge is a "freight forwarding company" that transports cargo such as sand and gravel all over the world "by barges." Anderson testified that after the company purchased the vessel six or seven years ago, they removed "the main propulsion

---

[1] The State also charged Stoltman with unlawful possession of heroin.

3

system" and permanently anchored the vessel to the bottom of the Duwamish River using "spuds," large pipes drilled into the riverbed.

Anderson testified the vessel was used as moorage to "secure our vessels." Anderson said that Island Tug and Barge has "45 pieces of equipment that we're trying to tie up." Anderson testified the vessel was large enough to accommodate four barges at a time and the barges often contained goods, including "[crushed] trucks, frozen stuff, whatever we had on the barge at the time." Anderson stated Island Tug and Barge did not permit anyone to enter the vessel without permission, including employees.

Anderson testified that Island Tug and Barge left "equipment on the vessel" that it could use to pull the spuds out to move the vessel. Anderson explained the equipment that had been stolen or damaged in the burglary destroyed "a lot of our systems."

> They pulled the generator apart and got inside the windings and removed the windings of the generator, which is all copper. They had gotten into the main panel, opened up the main panel and taken our breakers and then taken out all the wire going to the main panel that helped us make power so we could do stuff with the equipment.

Anderson testified that seven of the handles were removed from the transfer manifold and, as a result, he could no longer operate the valves to transfer fluids from one part of the vessel to another. Anderson said that "some of the valves and tanks" had also been removed.

Anderson testified that there was a crane on the deck of the vessel that the company used to "move stuff around." Because the crane was "tied in with the hydraulic system and the fuel system and the air system" that were all damaged in the burglary, the crane was no longer operational.

Valve expert James Kramer testified that the pipe valve recovered from Hibszki's boat was a "3-and-a-half inch, 150-pound flanged bronze swing check valve." Kramer said valve manufacturers "stopped producing that size [valve] decades ago," and estimated it would cost between $2,000 and $2,500 to purchase a similar valve.

Roberts testified that he used to "break into trucks, break into businesses, basically steal as much copper, brass, [and] metal" as he could, and then sell it to scrap yards to support his methamphetamine addiction. Roberts testified that he, Hibszki, and Stoltman stole metal from the vessel several times, including the night in July of 2010 when they stole the large pipe valve. Roberts testified that they were on the vessel "[m]ost of the night." Roberts said he "[c]ut copper wires out of walls, disconnected brass valves and pipes, copper pipes, [and] cut metal out of the boat." Roberts testified that he helped Hibszki "unbolt" the large valve that was "in the ceiling of the boat." Roberts said it took a while to unbolt the valve because "the bolts were rusted and painted." Roberts testified that he, Hibszki, and Stoltman each left the vessel "with a duffle bag full of metal."

At the conclusion of the State's case, the defense moved to dismiss the burglary charge on the grounds that the State had not presented "enough evidence to describe this ship as a building, for one to conclude beyond reasonable doubt that it's a building." The defense attorney conceded the vessel was a "structure" but argued it was not a "building" because it was basically a "dock or a pier" and was not being used to store or sell "goods." The court denied the motion. The court ruled that "using the expansive definitions given in other cases . . . , one may refer to this particular structure as a building."

5

The court used 11 Washington Practice: Washington Pattern Jury Instructions: Criminal (3d ed. 2008) (WPIC) to instruct the jury on the elements of the crimes, reasonable doubt, and accomplice liability. Hibszki's attorney proposed omitting the "abiding belief" language from the reasonable doubt instruction but did not otherwise object to the jury instructions. The jury instruction defining "building" states:

> Building, in addition to its ordinary meaning, includes any dwelling, fenced area, railway car, or cargo container. Building also includes any other structure used for lodging of persons or for carrying on business therein or the use, sale or deposit of goods.

During closing, the prosecutor argued the vessel was a structure used to store goods. The prosecutor also argued that Hibszki and Stoltman "acted together."

> The defendants acted together as an accomplice. Whether you think that one defendant took the 40-pound valve . . . . or that the other defendant took the wheel handles, it doesn't matter. They acted together. They are an accomplice and they are both guilty of that crime.

Hibszki's attorney argued that because the vessel did not meet the definition for a building, the jury should find him not guilty of burglary. The attorney also argued there was no evidence Hibszki was guilty as a principal or as an accomplice to the burglary. The attorney claimed that even if Roberts gave Hibszki the items to sell, that did not make Hibszki an accomplice any more "than if these things had ended up at the scrap yard," and "the guy [at the scrap yard] taking the stuff is not an accomplice to a burglary."

The jury found Hibszki not guilty of malicious mischief in the second degree. The jury found Hibszki guilty of burglary in the second degree and theft in the second degree.[2] The court imposed a standard range sentence of 10 months.

ANALYSIS

Burglary Conviction

Hibszki contends insufficient evidence supports the conviction for burglary in the second degree. Hibszki asserts the State failed to establish that the vessel was a "building" as defined by RCW 9A.04.110(5).

Under the Fourteenth Amendment and the Sixth Amendment of the United States Constitution and article I, section 21 of the Washington State Constitution, a criminal defendant is entitled to " 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " Apprendi v. New Jersey, 530 U.S. 466, 476-77, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)[3] (quoting United States v. Gaudin, 515 U.S. 506, 510, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995)). The State has the burden of proving the elements of a crime beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); State v. Borrero, 147 Wn.2d 353, 364, 58 P.3d 245 (2002).

In deciding whether sufficient evidence supports a conviction, we must view the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A challenge to the

---

[2] The jury found Stoltman not guilty of malicious mischief in the second degree. The jury found Stoltman guilty of burglary in the second degree, theft in the second degree, and violation of the Uniform Controlled Substances Act, chapter 69.50 RCW.

[3] Alteration in original.

sufficiency of the evidence admits the truth of the State's evidence. Salinas, 119 Wn.2d at 201. "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." Salinas, 119 Wn.2d at 201. We defer to the trier of fact on "issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004), abrogated in part on other grounds by Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

The meaning of a statute is a question of law subject to de novo review. State v. Ervin, 169 Wn.2d 815, 820, 239 P.3d 354 (2010). The authority to define the elements of a crime "rests firmly with the legislature." State v. Torres Ramos, 149 Wn. App. 266, 271, 202 P.3d 383 (2009); State v. Evans, 154 Wn.2d 438, 447 n.2, 114 P.3d 627 (2005). When interpreting a statute, our primary objective is to ascertain the intent of the legislature. State v. Kintz, 169 Wn.2d 537, 547, 238 P.3d 470 (2010); State v. Gonzalez, 168 Wn.2d 256, 263, 226 P.3d 131 (2010). In determining legislative intent, we must give effect to the plain language of an unambiguous statute. See State v. Bunker, 169 Wn.2d 571, 577-78, 238 P.3d 487 (2010); Gonzalez, 168 Wn.2d at 263; State v. Jacobs, 154 Wn.2d 596, 600-01, 115 P.3d 281 (2005). Language is unambiguous if it is not susceptible to two or more reasonable interpretations. State v. Delgado, 148 Wn.2d 723, 726-27, 63 P.3d 792 (2003). If the plain language of the statute is unambiguous, the inquiry is at an end, and we enforce the statute "in accordance with its plain meaning." State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). "When a statutory term is undefined, the words of a statute are given

their ordinary meaning, and the court may look to a dictionary for such meaning." Gonzalez, 168 Wn.2d at 263.

A person commits the crime of burglary in the second degree if, "with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building other than a vehicle or a dwelling." RCW 9A.52.030(1). RCW 9A.04.110(5) defines "building" as follows:

> "Building," in addition to its ordinary meaning, includes any dwelling, fenced area, vehicle, railway car, cargo container, or any other structure used for lodging of persons or for carrying on business therein, or for the use, sale, or deposit of goods; each unit of a building consisting of two or more units separately secured or occupied is a separate building.

RCW 9A.04.110 does not define "structure" or "goods." Webster's Third New International Dictionary 2267 (2002) defines a "structure" as "something constructed or built." "Goods" are defined as "tangible movable personal property" or "chattels, wares, merchandise." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, at 978.

Washington cases have broadly interpreted the definition of "building" under RCW 9A.04.110(5). See, e.g., State v. Johnson, 159 Wn. App. 766, 772, 247 P.3d 11 (2011) (holding even if a locomotive is not a "railway car" it still qualifies as a "building" under the ordinary meaning of the term); State v. Tyson, 33 Wn. App. 859, 862-63, 658 P.2d 55 (1983) (holding a semitrailer attached to a truck tractor and parked in a freight terminal is a "building" because it is either a cargo container or "other structure used for the deposit of goods").

Hibszki contends insufficient evidence supports his burglary conviction because the State did not prove beyond a reasonable doubt that he entered or remained unlawfully in a "building." Viewed in the light most favorable to the State, sufficient

9

evidence supports the conclusion that the vessel was a "building" under RCW 9A.04.110(5). Testimony at trial established that the vessel was "permanently affixed" to spuds or large pipes embedded in the bottom of the river. Anderson testified that Island Tug and Barge used the vessel as "storage" to secure barges. Anderson testified that the barges tied up to the vessel often contained goods like sand, gravel, and crushed trucks. The testimony at trial also established that the vessel had valuable equipment and salvageable materials on board, including generators, breakers, copper wiring and pipes, brass valves, and an operational crane that Island Tug and Barge could use to "move stuff around."

Because a jury could reasonably infer from this testimony that the vessel was a "structure" used for the "use, sale, or deposit of goods," RCW 9A.04.110(5), we conclude sufficient evidence supports Hibszki's conviction for burglary in the second degree.

Jury Instructions

Hibszki asserts the jury instructions did not clearly state that the State has the burden of proving accomplice liability beyond a reasonable doubt.

We review a challenge to a jury instruction de novo, evaluating the jury instruction "in the context of the instructions as a whole." State v. Bennett, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007). " 'Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law.' " Keller v. City of Spokane, 146 Wn.2d 237, 249, 44 P.3d 845 (2002) (quoting Bodin v. City of Stanwood, 130 Wn.2d 726, 732, 927 P.2d 240 (1996)). If a jury instruction correctly states the law, the trial

court's decision to give the instruction will not be disturbed absent an abuse of discretion. State v. Aguirre, 168 Wn.2d 350, 364, 229 P.3d 669 (2010). Jury instructions that relieve the State of its burden of proof may be challenged for the first time on appeal. State v. O'Hara, 167 Wn.2d 91, 100-01, 217 P.3d 756 (2009); State v. Peters, 163 Wn. App. 836, 847, 261 P.3d 199 (2011).

There is no dispute that the jury instructions accurately informed the jury of the State's burden of proof. The "to convict" instructions also accurately state the necessary elements to find "the defendant" or "defendant Hibszki" guilty of the crimes of burglary in the second degree, theft in the second degree, and malicious mischief in the second degree.

The jury instructions defined accomplice liability based on 11 WPIC 10.51, at 217. Jury instruction 7 states:

> A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable. A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime.
> A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:
> (1) solicits, commands, encourages, or requests another person to commit the crime; or
> (2) aids or agrees to aid another person in planning or committing the crime.
> The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.
> A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

The court also gave a cautionary instruction on accomplice testimony based on 11 WPIC 6.05, at 184. Jury instruction 8 states:

> If you believe Mr. Roberts to have been an accomplice, such testimony given on behalf of the State, should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution. You should not find the defendant guilty upon such testimony alone unless, after carefully considering the testimony, you are satisfied beyond a reasonable doubt of its truth.

Hibszki concedes accomplice liability is not an element of the crime that must be included in the "to convict" instruction. Hibszki contends that because the accomplice liability instruction "was completely silent as to the State's burden of proof," and the "to convict" instructions did not incorporate accomplice liability language, the jury instructions improperly relieved the State of its burden of proving accomplice liability beyond a reasonable doubt.

This court considered and rejected a similar argument in State v. Teal, 117 Wn. App. 831, 73 P.3d 402 (2003). In Teal, although the accomplice liability instruction did not refer to the reasonable doubt standard, and the "to convict" instruction did not incorporate accomplice liability language, we concluded that as a whole, the jury instructions satisfied due process and did not relieve the State of its burden of proof. Teal, 117 Wn. App. at 839-40.

> "Considered as a whole, the instructions required the jury to determine defendant's liability as an accomplice in light of the elements of the principal crimes in the perpetration of which such liability arose and under the overall requirement that criminal liability must be proved beyond a reasonable doubt. There was no error."

Teal, 117 Wn. App. at 841 (quoting State v. Teaford, 31 Wn. App. 496, 500, 644 P.2d 136 (1982)).

12

Here, as in Teal, the instructions required the State to prove the elements of the crimes and accomplice liability beyond a reasonable doubt. Considered as a whole, the jury instructions correctly informed the jury of the State's burden of proof with regard to accomplice liability.

Hibszki also argues that because the information did not charge him as an accomplice, the court erred by instructing the jury that a person is guilty of a crime if they are an accomplice to the crime. But, contrary to Hibszki's argument, the State is not required to allege accomplice liability in the information. Teal, 117 Wn. App. at 838. Criminal liability is the same whether one acts as a principal or as an accomplice. State v. Carter, 154 Wn.2d 71, 78, 109 P.3d 823 (2005). Accomplice liability is not an element or alternative means of committing a crime but, rather, is an alternative theory of liability. Teal, 117 Wn. App. at 838. "It is constitutionally permissible to charge a person as a principal and convict him as an accomplice, as long as the court instructs the jury on accomplice liability." State v. Bobenhouse, 143 Wn. App. 315, 324, 177 P.3d 209 (2008).[4] The court did not abuse its discretion by instructing the jury on accomplice liability.

Hibszki also claims that the order of the jury instruction defining accomplice liability and the instruction on accomplice testimony was confusing. We disagree. The court specifically instructed the jury that the order of the instructions "has no significance" and directed the jury to "consider the instructions as a whole." We presume the jury followed the court's instruction. State v. Stein, 144 Wn.2d 236, 247, 27 P.3d 184 (2001).

---

[4] Emphasis in original.

We also conclude the jury inquiry does not show the accomplice liability instructions were "unduly confusing." During deliberations, the jury submitted an inquiry to the court, stating, "Can one be convicted of 2nd degree Burglary without entering the building but acting as an accomplice to the other individual committing 2nd degree Burglary?" The court directed the jury to "refer to the Court's Instructions." The inquiry does not indicate the jury was confused about the theory of accomplice liability.

We affirm.

WE CONCUR:

# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON
## DIVISION ONE

UNION BANK, N.A., as successor-in-interest to the FDIC as Receiver for Frontier Bank,

        Appellant,

        v.

F.R. MCABEE, INCORPORATED, A Washington corporation, FAR NORTH VENTURES, LLC, a Washington limited liability company, A. SUZANNE WARE, an unmarried individual, G. PAUL WARE an unmarried individual, JARED WARE and NOELLE WARE, husband and wife, LEVI WARE and STEPHANIE WARE husband and wife, ADAM WARE and KATHERINE WARE, husband and wife,

        Respondents.

No. 70497-4-I

UNPUBLISHED OPINION

FILED: April 13, 2015

PER CURIAM — Following the Washington Supreme Court's decision in Washington Federal v. Harvey, ___ Wn.2d ___, 340 P.3d 846, 2015 WL 114165 (2015), the parties in this appeal filed a stipulation to the reversal of the trial court's judgments. The parties also stipulate that the trial court on remand shall determine the amount of any award for attorney fees and costs incurred in the appellate proceedings.

We lift the stay previously imposed, accept the parties' concession, reverse, and remand for further proceedings.

FOR THE COURT:

_____

Becker, J.

_____

Leach, J.

_____